DISCIPLINARY BOARD OF THE HAWAII SUPREME COURT, Petitioner, *v.* DAVID DOUGLAS BERGAN, Respondent Attorney

NO. 6588

MARCH 29, 1979

RICHARDSON, C.J., OGATA AND MENOR, JJ., AND RETIRED JUSTICES KOBAYASHI AND MARUMOTO, ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY RICHARDSON, C.J.

The instant matter was brought before this court by a petition filed by the Office of Disciplinary Counsel pursuant to Rule 16 of the Rules of the Supreme Court of the State of Hawaii. We are faced with the determination of appropriate disciplinary action to take in this case, having been informed of respondent's conviction for a Rule 16 crime. The following facts are pertinent.

The respondent attorney, David Douglas Bergan (hereinafter respondent), was admitted to practice before the Supreme Court of the State of Hawaii on April 27, 1976.[1] On July 12, 1976, while employed as a law clerk to the administrative judge of the first circuit court, respondent was arrested by Federal Drug Enforcement Administration agents while in the process of consummating a sale of approximately 385 grams of thirty-seven percent pure cocaine. The two-count federal grand jury indictment that followed charged respondent and his co-defendants with the knowing and intentional possession (with intent to distribute) of cocaine (Count I) and with the knowing and intentional distribution of cocaine (Count II), both violations of Section 841(a)(1) of Title 21, United States Code, and Section 2 of Title 18, United States Code.

---

[1] As required by Rule 15 of the Rules of the Supreme Court of the State of Hawaii, respondent took and subscribed to the following oath of office upon being admitted to the bar of this state:

I do solemnly swear that I will support and defend the Constitution of the United States and the Constitution and laws of the State of Hawaii, that I will faithfully discharge my duties as attorney, counselor and solicitor in the courts of the state, to the best of my ability.

548

On April 13, 1977, pursuant to a negotiated plea agreement,[2] respondent pleaded guilty to Count I of the indictment and was convicted of knowingly and intentionally possessing with intent to distribute cocaine. Thereafter, he was sentenced to a term of imprisonment for three years with a special parole term of three years.

On May 31, 1977, the Office of Disciplinary Counsel (hereinafter Disciplinary Counsel) initiated formal disciplinary proceedings against respondent by filing a petition and certificate of conviction in this court. The petition alleged that respondent had been convicted of a crime which constituted a felony in Hawaii,[3] and requested that respondent be restrained from engaging in the practice of law pending final disposition of the disciplinary proceeding. This court, on June 1, 1977, ordered respondent to cease and desist from engaging in the practice of law until further order of this court. Sup. Ct. R. 16.13(a).

Commencing on June 2, 1977, a hearing was held before a three-member hearing committee of the Disciplinary Board of the Hawaii Supreme Court (hereinafter Disciplinary Board) for the sole purpose of determining the extent of discipline to

---

[2] On February 25, 1977, respondent entered into a plea arrangement with the United States whereby the Government would move to dismiss Count II of the indictment provided respondent pleaded guilty to Count I. It was further agreed that respondent would be sentenced to the custody of the United States Attorney General for a period of three years under 18 U.S.C. § 4205(b)(2)(1976).

[3] Upon being convicted of a crime which is, or if it had been committed in Hawaii would have been, a felony, an attorney becomes subject to disciplinary action regardless of whether the offense involves moral turpitude or dishonesty. Sup. Ct. R. 16.13.

Had respondent been tried and convicted under the Hawaii Penal Code, Title 37 of the Hawaii Revised Statutes, he would have been guilty of promoting a dangerous drug in the first degree in violation of HRS § 712-1241 (1976). This section provides in pertinent part:

   (1) A person commits the offense of promoting a dangerous drug in the first degree if he knowingly:
     (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
       (i) One ounce or more, containing any of the respective alkaloids or salts of heroin, morphine, or cocaine; . . .

   . . . .

   (2) Promoting a dangerous drug in the first degree is a class A felony.

be imposed. Sup. Ct. R. 16.13(c). After listening to extensive testimony over a three-day period and after reviewing all the evidence presented, the hearing committee submitted a report to the Disciplinary Board setting forth its findings and recommendation. The most relevant portions of this report are as follows:

FINDINGS OF FACT AND CONCLUSIONS OF LAW

. . . .

6. While attending law school at _____, the Respondent was employed with _____, an accounting firm in Washington, D. C., and after graduation from law school in 1973 he was employed by that company in its tax department.

7. While employed at [the accounting firm] Respondent was introduced to cocaine by other members of the firm, and thereafter became a casual occasional user of the drug, using same in the company of his contemporaries from [the accounting firm], and others.

8. In the course of his occasional and social use of cocaine, Respondent met and became friends with a person known to him as Haji who was a bartender at an establishment in Washington, D.C., frequented by Respondent.

9. Haji and Respondent became close friends and Haji often sold Respondent small amounts of cocaine for Respondent's personal use.

10. Sometime prior to January 1976, Respondent began living with a young woman and her child in Washington, D.C., to whom he refers as his wife and son.

11. Sometime in 1975 Respondent decided to move to Hawaii and did so in January 1976. His initial plan was to come to Hawaii alone, initially, study for and take the bar examination, obtain employment, then move said woman and child here. After arriving in Hawaii Respondent studied for and took the February 1976 bar examination.

12. After moving to Hawaii, Respondent continued his occasional social use of cocaine seeking out a source

of supply, in the course of which he met one Jerry Porter, who became Respondent's supplier of cocaine.

13. After passing the Hawaii bar examination, Respondent was hired by the Honorable Norito Kawakami, then Administrative Judge of the First Circuit Court, State of Hawaii.

14. Thereafter, Respondent sent for said woman and child. The woman quit her job in Washington, D.C., and with her child moved to Hawaii to be with Respondent. They then found and moved into an apartment for which they paid $550.00 per month rent. With the expenses of living in Honolulu without an income while studying for and taking the bar examination and prior to obtaining employment, the moving expenses for himself, said woman and child and his relatively low-paying job as a law clerk to Judge Kawakami, Respondent quickly exhausted his savings.

15. Not long after coming to Hawaii, Respondent was contacted by his friend Haji who would call him by telephone from time to time. At some point the subject of cocaine came up and Haji then inquired whether Respondent could arrange for him to purchase a substantial quantity of the drug; Respondent refused.

16. By the end of May 1976, Respondent was experiencing financial difficulty and his paycheck was insufficient to meet his obligations. Respondent attempted to obtain a loan from various banks and finance companies but was told that his credit was not good because he had not been here in Hawaii sufficiently long and had no collateral. During this time Haji continued to call Respondent and repeated the request that Respondent assist him in the purchase of a supply of cocaine, from which purchase Respondent would benefit financially.

17. By early June 1976, Respondent's financial situation, in his mind, had become desperate and he agreed to assist Haji in the purchase of $4,000.00 worth of cocaine for financial profit.

18. On or about June 12, 1976, Haji arrived in Honolulu and gave Respondent $3,300.00 to purchase four

ounces of cocaine. Respondent paid Jerry Porter the $3,300.00 and Porter delivered him approximately four ounces of cocaine at $1,000.00 an ounce, extending Respondent credit for $700.00. The night after he had purchased the approximately four ounces of cocaine, Respondent realized that he had crossed the line from being a casual and occasional user of cocaine to being a trafficker in the drug and he flushed the approximately four ounces of cocaine down the toilet, along with his and Haji's anticipated profit.

19. When Haji discovered what had happened he was enraged and returned to Washington, D. C. Immediately thereafter he began calling Respondent on the telephone demanding repayment of the $3,300.00. Respondent promised to repay Haji over a period of time but Haji insisted on immediate payment claiming that he had borrowed the money from some people who were going to kill him and harm his family unless they were repayed [sic] immediately. Haji persisted in his demands and ultimately suggested that Respondent repay him by setting up another larger purchase of cocaine. Fearing for the safety of Haji, and what Haji might do to him, Respondent told him that he would do anything to help.

20. After Haji got the commitment from Respondent to do another larger cocaine transaction in order to meet Respondent's obligation to Haji, Haji informed the Metropolitan Police in Washington, D. C. who then began to tape record Haji's phone calls to Respondent. The Metropolitan Police eventually turned Haji and the whole matter over to Washington D. C. Office of the Drug Enforcement Administration, who in turn contacted their Honolulu office.

21. Once Respondent had committed himself to assisting Haji in the second purchase of cocaine in order to alleviate his obligation, Respondent went along with anything Haji said in order to get the transaction over with as soon as possible. Plans were made for Haji to return to Honolulu and consummate the second transaction in mid-July 1976. . . .

552

22. During the month of June, 1976, Respondent negotiated for the sale in Honolulu of 385 grams of 37% pure cocaine for the purchase price of approximately $16,000.00. Respondent did so with the knowledge that the proposed transaction would be unlawful.

23. On June 12, 1976,[4] the day of the transfer of 385 grams of cocaine into the hands of buyer, Respondent was arrested at the Honolulu International Airport as a result of surveillance by Federal Drug Enforcement Administration agents initiated by the tip of a confidential informant who was, at that time, unknown to Respondent.

. . . .

28. Upon the basis of testimony presented during the formal proceedings, the Committee finds Respondent's conduct involved moral turpitude within the meaning of that phrase as used in DR 6-102(A)(3). Such conduct warrants the imposition of serious discipline upon Respondent.

29. Sometime in September 1976 Respondent sought the help of Dr. Kosta Stojanovich, then Chief of Psychiatry at Straub Clinic & Hospital, Inc., who treated him initially by twice a week consultation, and medication. Dr. Stojanovich diagnosed Respondent's condition at that time as a state of severe depression. Dr. Stojanovich testified that he treated Respondent for a period of approximately five months, at the end of which time Dr. Stojanovich thought Respondent had gotten ahold of himself mentally and had learned to grapple with his situation and live with what he had done to himself.

. . . .

### RECOMMENDATION

While it is clear that Respondent violated a law which subjects him to discipline pursuant to Rule 16 of the Rules

---

[4] The record plainly indicates that the date of the sale in question and of respondent's arrest was July 12 and not June 12, as is reflected in the report of the hearing committee. This error was presumably made through inadvertence or clerical mistake.

of the Supreme Court of the State of Hawai [*sic*], there seem to be extreme mitigating circumstances surrounding his motivation in the commission of the crime such that the ultimate sanction of disbarment should not be imposed. It is respectfully recommended that Respondent's license to practice law in Hawaii be instead suspended for three years commencing with the issuance of the Ex Parte Disciplinary Restraining Order by the Supreme Court of the State of Hawaii on June 1, 1977.

After receipt of the hearing committee report, the Disciplinary Board heard oral argument by counsel for respondent and Disciplinary Counsel and, pursuant to Sup. Ct. R. 16.7(c), submitted its own findings and recommendations to this court in a report filed on December 6, 1977. Although the Disciplinary Board chose to adopt the findings of fact and conclusions of law of the hearing committee, it nevertheless rejected the committee's recommendation as to discipline. Instead of mere suspension for three years, the Board summarily recommended the disbarment of respondent.[5]

On December 27, 1977, respondent filed his exceptions to the Disciplinary Board's report, asserting that the hearing committee's recommendation to suspend his license to practice law was more appropriate than the Board's recommendation to disbar him. The matter was argued before this court on March 7, 1979.

It is the solemn duty of this court to regulate the practice of law in this state and to see that the integrity of the profession is maintained by disciplining attorneys who indulge in practices inconsistent with the high ethical standards demanded of all members of the bar. *Disciplinary Board of the Hawaii Supreme Court v. Kim*, 59 Haw. 449, 583 P.2d 333 (1978); *People ex rel. MacFarlane v. Harthun*, ___ Colo. ___, 581 P.2d 716 (1978). In carrying out this duty, we will not hesitate to impose substantial sanctions upon an attorney

---

[5] Under Sup. Ct. R. 16.7(c), the Disciplinary Board is empowered to either affirm or modify the recommendation of the hearing committee, remand the matter for further proceedings before the hearing committee, or dismiss the petition for discipline.

554

for any act — whether committed in a professional capacity or not — which evidences want of personal honesty and integrity or renders such attorney unworthy of public confidence.

There is no doubt that a violation of the federal narcotics law (also cognizable as a felony under state law) may be sufficient ground for disbarment. *See, e.g., In re Gorman,*___ Ind. ___, 379 N.E.2d 970 (1978); *In re Effron,* 58 A.D.2d 510, 397 N.Y.S.2d 100 (1977); *In re Glasser,* 53 A.D.2d 38, 385 N.Y.S.2d 86 (1976). Nevertheless, respondent contends that there are numerous mitigating circumstances present in this case that militate against the imposition of such a harsh sanction[6] and urges this court to adopt the recommendation of the hearing committee. Disciplinary Counsel, on the other hand, asserts that the recommendation of the Disciplinary Board is amply supported by the record.

As between the reports of the Disciplinary Board and its hearing committee, the factual findings contained in the report of the latter — whose members have had a first-hand opportunity to observe and assess the credibility of the witnesses — are entitled to greater weight than the factual findings contained in the report of the former. However, the Board's recommendation as to discipline should be accorded greater weight than the committee's recommendation. *See Toll v. State Bar of California,* 12 Cal.3d 824, 117 Cal. Rptr. 427, 528 P.2d 35 (1974). In any event, we are not bound by the findings and recommendations of either the Board or its committee and, in determining the sanction to be imposed, we will independently consider all the testimony and evi-

---

[6] In his opening brief, respondent submits that the following factors should be considered by this court in determining the extent of discipline to be imposed: (1) he has never before had disciplinary proceeding brought against him; (2) his involvement in this criminal offense was motivated in large part by a perceived domestic financial crisis; (3) he was only twenty-nine years of age at the time of the misconduct and committed the offense during a period of emotional difficulty; (4) his offense was not committed in his capacity as an attorney and was not in any way related to his practice of law; (5) he has already suffered the ignominy of a criminal conviction and has served time in a federal penal institution; (6) he has been candid and cooperative throughout the disciplinary proceedings; and (7) the hearing committee itself unanimously recommended a three-year suspension over disbarment. *See In re Kreamer,* 14 Cal.3d 524, 121 Cal. Rptr. 600, 535 P.2d 728 (1975).

dence in the record. *See Disciplinary Board of the Hawaii Supreme Court v. Kim, supra*. The power to suspend or revoke an attorney's license rests exclusively with this court. HRS § 605-1 (1976). *See In re Trask,* 46 Haw. 404, 380 P.2d 751 (1963).

After carefully considering all of the circumstances surrounding this case, including respondent's post-conviction behavior,[7] we have concluded that neither the recommendation of the Disciplinary Board nor that of the hearing committee should be adopted. While this court is of the opinion that the committee's recommendation for a three-year suspension does not adequately reflect the seriousness of the respondent's misconduct, we also believe, however, that a suspension of sufficient length would equally serve our purpose as would disbarment. Accordingly, this court has decided that respondent's license to practice law in this state shall be suspended for a period of five years.

In rendering this decision, we have considered the following factors to be particularly relevant. First of all, respondent has served his time in a penal institution and has suffered the ignominy of a criminal conviction. *Segretti v. State Bar of*

---

[7] In his reply brief and during oral argument before this court, respondent requested that he be allowed to apprise this court of the occurrences subsequent to his conviction and appearance before the hearing committee of the Disciplinary Board. Since we have original jurisdiction over the matter and since we feel that respondent's post-conviction behavior bears directly upon his fitness to remain in the profession, we have decided to consider this matter. *Cf. Yokozeki v. State Bar,* 11 Cal.3d 436, 113 Cal. Rptr. 602, 521 P.2d 858 (1974), *cert. denied,* 419 U.S. 900 (attorney's good behavior subsequent to the transaction in question was considered in mitigating discipline); *In re Rabow,* 20 A.D.2d 51, 244 N.Y.S.2d 1019 (1963)(same).

What transpired subsequent to respondent's conviction can be summarized as follows. After his appearance before the hearing committee in June 1977, respondent surrendered himself to the custody of the United States Marshal and commenced serving his three-year sentence in a federal correctional facility at Terminal Island, California. On June 9, 1978, exactly one year after the date of his incarceration, respondent was paroled. Thereafter, he returned to Hawaii where he was offered employment with a tax and financial consulting firm. Because of his extensive background in accounting and taxation, respondent has been able to work himself up to the position of vice president with the firm. Further, he has re-established contact with some of his former clients who are now seeking his expertise in the field of business and financial planning. There is also evidence that respondent's reputation is presently one of a hard working, productive member of his present field and community.

*California*, 15 Cal.3d 878, 126 Cal. Rptr. 793, 544 P.2d 929 (1976), *In re Kreamer, supra*. Furthermore, the fact that he is still subject to the restrictions of his regular and special parole terms is added assurance that he will not be repeating his prior misconduct. Secondly, following his return to this state upon being paroled, respondent has seemingly earned the respect and confidence of his business associates and has demonstrated his commitment toward self-rehabilitation.[8] Moreover, he has displayed candor, cooperation, and repentance throughout the disciplinary proceedings and a willingness to accept punishment for his misconduct. *See, e.g., Bradpiece v. State Bar of California*, 10 Cal.3d 742, 111 Cal. Rptr. 905, 518 P.2d 337 (1974); *In re Rabow, supra*. Lastly, we note that respondent voluntarily underwent psychiatric treatment after his commission of the offense, and his prognosis was favorable.

In view of these considerations, we believe that the interest of the public and the profession would best be served by suspending respondent rather than disbarring him. It is therefore ordered that respondent's license to engage in the practice of law shall be suspended for a period of five years — the maximum term of suspension under our rules — commencing with the issuance of this court's Ex Parte Restraining Order on June 1, 1977.

*Daniel G. Heely, Chief Disciplinary Counsel, (Sheila L. Yee,* Assistant Disciplinary Counsel, on the brief) for petitioner.

*Michael A. Weight (Weight & Ellsworth,* of counsel) for respondent attorney.

---

[8] Respondent has convinced this court that he will never again succumb to the temptation of drug usage. During the proceeding before the hearing committee, he testified as follows:

> [D]rugs are something that, even under casual usage, I would not partake in. I suppose it's easy to say now. I will not partake in. Not marijuana, pot, or marijuana and cocaine, speed or anything of that nature, or alcohol which I consider a drug.

Further, during oral argument before this court, respondent represented that he had successfully completed an extensive drug rehabilitation program while imprisoned in the federal correctional facility.