OFFICE OF DISCIPLINARY COUNSEL, Petitioner, *v.* CHARLES H. SILVA, JR., Respondent

NO. 7631

SEPTEMBER 10, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

*Per Curiam.* On June 12, 1981, this court issued an order immediately disbarring Charles H. Silva, Jr. (Respondent) from the practice of law. That order stated that an opinion would thereafter be filed. This opinion is in accordance with that order.

On November 14, 1979, the Disciplinary Board of the Supreme Court submitted to the court a Report and Recommendation for the Disbarment of Charles H. Silva, Jr. On March 13, 1981, the Disciplinary Board filed a second Report and Recommendation for Disbarment, dealing with separate disciplinary violations. The alleged misconduct by Respondent involved, *inter alia,* conversion of clients' funds, dishonesty and fraud, implications that he was able to improperly influence a public official, and failure to carry out a contract of employment. After close examination of the entire record and legal precepts, we agree with the recommendations of the Disciplinary Board that Respondent be disbarred from the practice of law.

## I.

This action was originally initiated in late 1978 and early 1979 when a petition for discipline, an amended petition, and a second amended petition were filed and served upon Respondent by the Office of Disciplinary Counsel. Respondent did not file an answer to any of the petitions. However, after the deadlines for filing answers to the respective petitions had passed, *see* Supreme Court Rule 16.7(b), Respondent twice filed affidavits of consent to disbarment. These affidavits of consent were rejected by the Chairman of the Disciplinary Board because Respondent failed to acknowledge that the material facts alleged in the petitions were true, as required by Supreme Court Rule 16.14(a).[1]

---

[1] Supreme Court Rule 16.14(a) reads:

(a) An attorney who is the subject of an investigation into, or a pending proceeding involving, allegations of grounds for his discipline may consent to disbarment, but only by delivering to the Board an affidavit stating that he desires to consent to disbarment and that:

(1) his consent is freely and voluntarily rendered; he is not being subjected to coercion or duress; he is fully aware of the implications of submitting his consent;

(2) he is aware that there is a presently pending investigation into, or

The matter was then assigned to a hearing committee and a hearing was held on April 27, 1979. Both Respondent and his attorney were present at the hearing. Upon commencement of the hearing, Disciplinary Counsel requested, pursuant to Supreme Court Rule 16.7(b), that all of the charges in the second amended petition for discipline be admitted as true since Respondent had failed to file an answer. Respondent objected, arguing that his consent affidavits acted as answers. The hearing committee ruled that the affidavits were not answers and admitted all of the allegations as true.

On July 16, 1979 the hearing committee filed with the Disciplinary Board its findings of fact, conclusions of law and recommendation for disbarment of Respondent. Briefs were received from both Respondent and the Office of Disciplinary Counsel. Respondent argued that the hearing committee's ruling on his failure to answer was essentially a judgment of default and, under HRCP Rule 55(b)(2), he was required to be served with written notice at least 3 days prior to the hearing. He also argued that admission of his former client's deposition was erroneous because, *inter alia,* he had not been given sufficient notice of the deposition. The Disciplinary Board adopted the findings of fact and conclusions of law of the hearing committee and further held that admission of the deposition, if error, was harmless since Respondent had been given notice of the taking of the deposition and had in fact been present and cross-examined the deponent. The Board's decisions were then brought before the supreme court for review. On April 25, 1980, when Respondent's opening brief was in default, Petitioner Disciplinary Counsel moved in this court for the disbarment of Respondent.

Two months earlier, on February 28, 1980, Petitioner initiated a second case for discipline involving a separate set of circumstances against Respondent. On July 1, 1980, the hearing committee filed

---

proceeding involving, allegations that there exist grounds for his discipline, the nature of which he shall specifically set forth;

(3) he acknowledges that the material facts so alleged are true; and

(4) he submits his consent because he knows that if charges were predicated upon the matters under investigation, or if the proceeding were prosecuted, he could not successfully defend himself.

with the Disciplinary Board its findings of fact, conclusions of law and recommendation for the disbarment of Respondent based on the new matters raised in the second proceeding.

In the meantime, with Respondent's consent, this court ordered, *inter alia,* that the motion for disbarment previously filed in this court be held in abeyance and that Respondent be temporarily suspended from the practice of law until further order of the court. In October 1980, upon the motion of Petitioner, the court ordered that the temporary suspension be continued and that Dr. Elizabeth Adams be appointed to examine Respondent to determine whether he was suffering from any physical or mental infirmities which would make it impossible for him to defend himself adequately. Dr. Adams concluded from her investigation that Respondent had no physical or mental condition which would prevent him from defending himself.[2]

On January 28, 1981, this court ordered that disciplinary proceedings against Respondent be resumed while continuing Respondent's temporary suspension from the practice of law. Additionally, the court held in abeyance a decision on the charges currently before it, pending the report and recommendation by the Disciplinary Board with respect to the second set of charges then pending before the Board. Thereafter, on March 13, 1981, the Disciplinary Board adopted the findings of fact and conclusions of law made by the hearing committee, recommending to the supreme court that Respondent be disbarred from the practice of law on the second set of charges.

On May 13, 1981, Petitioner moved a second time in the supreme court for the disbarment of Respondent. Hearing of the second motion was then set for argument on May 28, 1981, but was later postponed to June 9, 1981.[3] The court having heard arguments on

---

[2] Dr. Adams particularly stated in her January 7, 1981 letter to the court:

I predict that Mr. Silva would drink heavily during the course of disciplinary proceedings and that impairments of memory and judgment might present some problems for him. Aside from this, however, he should be able to defend himself adequately.

[3] In a letter dated June 5, 1981, Respondent requested a four-month continuance of the June 9 hearing because he was an alcoholic, "almost constantly intoxicated in recent months," was seeking medical treatment, and felt himself unable to adequately

that later date with respect to Petitioner's second motion for disbarment, and having heard arguments on July 2, 1980 with respect to Petitioner's first motion for disbarment, this court issued an order on June 12, 1981 immediately disbarring Respondent. The disbarment was based on Respondent's professional misconduct in his handling of three unrelated cases. Due to the serious nature of the Respondent's misconduct, we detail below his actions in all three cases.

However we must first briefly address Respondent's argument that certain prejudicial procedural irregularities occurred in the course of these disciplinary proceedings.

We reject Respondent's contention that his two affidavits of consent with respect to the first set of charges should have been treated as answers. The affidavits were filed after all deadlines for filing answers to the respective petitions had passed. *See* Supreme Court Rule 16.7(b), which provides that a respondent

> shall serve his answer . . . within 20 days after the service of the petition, unless such time is extended by the Chairman. In the event the respondent fails to answer, the charges shall be deemed admitted; provided, however, that a respondent who fails to answer within the time provided may obtain permission of the Chairman to file an answer if such failure to file an answer was attributable to mistake, inadvertence, surprise or excusable neglect.

In the instant case Respondent did obtain one extension, but failed to file an answer within the extended period. Respondent failed to obtain any further extensions and similarly failed to obtain permission to file a late answer. Although we would encourage the Chairman to allow an extension or late answer whenever it appears that the issues would be clarified by the answer or that the answer would allow a respondent a more meaningful factual hearing, we see no basis for disturbing the hearing committee's determination that the first set of charges against Respondent must be deemed admitted as

---

participate in his own defense. On June 12, 1981, Respondent filed a similar Motion for Order Staying Imposition of Sanctions. However, taking into account the lengthy delays which already had occurred in these proceedings, we declined to give the benefit of any last-minute postponement.

a result of Respondent's failure to file answers to the petition and amended petitions.

We reject as without merit Respondent's contention that, after the charges were deemed admitted, he was entitled to a "setting aside of default" pursuant to HRCP Rule 55(b)(2) and HRCP Rule 60(b).

Respondent also alleges certain defects in the prehearing discovery proceedings. We agree with the Disciplinary Board's conclusion, described *supra,* that if there was any error in notifying Respondent of a certain deposition, the error was harmless. We see no merit in Respondent's related contention that all discovery proceedings were invalid because they were not preceded by a prehearing conference.

Having disposed of the procedural issues in this case, we proceed to a discussion of Respondent's professional misconduct in the three separate cases.

## II.

In 1973, Respondent undertook to represent the heirs of an estate. He was retained to begin probate proceedings and to represent the heirs in litigation brought by third parties against the estate. One asset of the estate was a parcel of land, zoned agricultural, located in Kaneohe. Respondent discussed with his clients the possibility of obtaining a zoning variance or rezoning the property to urban use. Respondent informed the estate heirs that he knew people in government who would be able to assist in the rezoning but that certain monies would have to be paid to accomplish that purpose. In Respondent's second affidavit of consent to disbarment, which he introduced into evidence at his hearing before the hearing committee, he admitted that he had had these discussions with the estate heirs and stated that he did pay money belonging to the estate "to a third party developer for the purpose of intending to influence a Honolulu City Council member to assist in obtaining a zoning variance from agricultural to urban use of the estate's real property."

During the course of disciplinary proceedings, two depositions were taken of Respondent. In the first deposition, Respondent testified that he turned over approximately $10,000 to a developer to aid the zoning change. Respondent stated that $5,000 was for the

developer and $5,000 was for a city council member. Respondent further testified that when the estate heirs requested the money be returned, he recovered the $10,000 from the developer. However, in the second deposition, Respondent contradicted his first testimony and stated that the money that he returned to the estate was money he had received from third parties in a completely unrelated transaction as payment for his interest in a boat. Other evidence, including a cancelled check for $9,927.58 made out to Respondent from the third parties, corroborates Respondent's testimony in his second deposition. The evidence also shows that Respondent, upon being asked to return the $10,000 to the estate, deposited $9,927.58, the exact amount paid to him for his interest in the boat, to the estate account.[4]

Two heirs of the estate were appointed estate administrators and had sole signature authority on the estate checking account. $10,000 was loaned to that account by the widow of the decedent. The estate administrators testified that on several occasions, Respondent convinced them to sign blank checks and leave them with him, allegedly to pay estate debts. However, on three separate occasions, Respondent's name was entered on the checks as payee and the monies were converted to his own use and benefit. The total amount of estate monies converted in this manner was $4,700. The estate also received monthly rentals which were mailed to Respondent for deposit in an estate account. On twelve occasions, Respondent deposited only a portion of the rentals and converted the remainder to his own use without the knowledge or consent of his clients. In this manner, Respondent converted $3,946.00 of the rental amounts to his own use. In total, Respondent converted approximately $8,646.00 of the estate's funds.

During the course of his representation of the estate heirs, Respondent failed to pay certain estate debts. Respondent also failed to answer a request by one of the estate administrators for a full accounting of all estate funds that Respondent had handled.

Respondent sent a letter to the estate heirs notifying them that a hearing had been scheduled for a certain date at which a petition for

---

[4] There is nothing in the record to indicate that Respondent paid or even approached a city council member with an offer to pay for special consideration in the rezoning matter.

partial distribution would be presented to the probate court and a full accounting of the financial status of the estate given. In fact, Respondent had not prepared or filed a petition for partial distribution and had not scheduled a hearing on this matter.

Finally, because of Respondent's failure to carry out his duties with regard to estate matters, the estate heirs hired another attorney who demanded that Respondent return the files and prepare an accounting of all estate monies.

The facts of this case speak for themselves. During the course of representing the estate heirs, Respondent stated that he could improperly influence a public official, on numerous occasions converted estate monies to his own use, failed to pay estate bills, made misrepresentations to his clients, and failed to surrender estate funds and render an accounting. Additionally, during the course of the investigation of this matter, Respondent gave false testimony and failed to comply with a subpoena and subpoena duces tecum issued by the Office of Disciplinary Counsel. The Disciplinary Rules violated by Respondent include the following: DR 9-101(C) prohibiting an attorney from stating or implying that he is able to improperly influence a public official; DR 1-102(A) (4) regarding misconduct involving dishonesty, fraud, deceit, or misrepresentation; DR 1-102(A)(5) regarding conduct prejudicial to the administration of justice; DR 1-102(A)(6) regarding conduct adversely reflecting on an attorney's fitness to practice law; portions of DR 9-102 regarding the preservation of the identity of client funds and property; DR 6-101(A)(3) regarding neglect of a legal matter; and DR 7-101(A)(2) regarding failure to carry out a contract of employment.

## III.

In another case, Respondent was retained by a client to initiate proceedings to collect monies past due on an agreement of sale and to cancel the agreement. The delinquent parties forwarded a check for $6,434.37 made out to Respondent and his client for the monies owed. The client refused tender of payment, gave the check to Respondent without endorsing it, and asked Respondent to proceed with cancellation of the agreement of sale. Respondent, instead of returning the check to the delinquent parties, deposited it into a

checking account and converted $6,384.37 of those funds to his own use and benefit. Subsequently, the client hired another attorney who was able to recover all but $90.00 of the $6,434.37.

Although Respondent's conduct in this second case seems to be much less reprehensible than in the first case discussed above, we have often held that conversion of a client's funds will result in the most severe sanction. *Office of Disciplinary Counsel v. Johnson*, 62 Haw. 95, 611 P.2d 993 (1980); *Office of Disciplinary Counsel v. DeMello*, 61 Haw. 223, 601 P.2d 1087 (1979); *Disciplinary Board v. Kim*, 59 Haw. 449, 583 P.2d 333 (1978); *In re Achi*, 10 Haw. 7 (1895); *In re Mahoe*, 3 Haw. 255 (1871). We do not feel it is necessary to detail each of the Disciplinary Rules violated by Respondent in this case. Suffice it to say that at the very least his misconduct contravened DR 9-102 regarding the preservation of client funds.

## IV.

In a third unrelated case, Respondent agreed to represent a client in a workers' compensation case. After some negotiation, Respondent wrote to the insurance company requesting $5,710.40 to settle the workers' compensation claim. The insurance company later presented to Respondent in settlement of the client's claim a check in the amount of $5,710.40 payable only to the client. Instead of transmitting any of the settlement proceeds to the client, Respondent signed the client's name to the check, depositing it into a checking account entitled "Charles H. Silva, Jr., Client's Deposit Account; No. 01-344943."

At a January 21, 1980 meeting, Respondent informed his client that he had received a settlement check from the insurance company. Respondent further caused his client to sign a letter stating in part:

I [client] have endorsed the settlement check in the sum of $5,710.40 over to my attorney, for deposit into his client's deposit account, effective as of January 4, 1980.

(Bracketed material added.) The above sentence was incorrect because the client had not in fact endorsed the settlement check. Subsequently, Respondent presented to the client a check payable to the client in the amount of the settlement. However the client was unable to cash the check, learning that the account had been closed.

Respondent had closed the account and opened a new account in the amount of $5,710.40 at the same bank. From this new account, Respondent withdrew, without his client's consent, most of the funds for his personal use and benefit.

Meanwhile, the client had retained the services of another attorney to attempt to recover the amount of the settlement. Efforts to recover the funds proved fruitless. Respondent maintained that he received permission by the client to use the proceeds as advanced "costs" for a personal injury automobile case that he was handling for the client. The client denied giving such permission. Furthermore, the evidence indicates that Respondent did not use the funds for costs in the automobile collision case.

Respondent ultimately admitted that he owed his client $5,710.40, the amount of the settlement, and finally paid that amount to his client on May 7, 1980.

Again we do not feel it necessary to detail each of the Disciplinary Rules violated by Respondent in this case. Respondent's conduct here is just as culpable as in the cases discussed above. Although Respondent did finally deliver the settlement proceeds to his client, we have ruled that the fact that an attorney eventually returns money to his client does not lessen the attorney's culpability. *Office of Disciplinary Counsel v. Johnson*, 62 Haw. 95, 611 P.2d 993 (1980).

This court has repeatedly held that we will demand the strictest rules of conduct from attorneys with respect to clients' funds. Respondent's misappropriation of his clients' funds would by itself require disbarment. *Johnson, supra*, 62 Haw. at 97, 611 P.2d at 995, and cases cited therein. Unfortunately Respondent has also committed other serious disciplinary violations in the course of the three cases described in this opinion.

V.

In disciplinary cases this court attempts to be sensitive to the possible existence of mitigating circumstances. Thus we occasionally have imposed a less severe penalty than recommended by the Disciplinary Board, where we have found sufficient mitigating factors. *See, e.g., Office of Disciplinary Counsel v. Kagawa*, 63 Haw. 150, 157-59, 622 P.2d 115, 120-21 (1981); *Office of Disciplinary Counsel v. Klein*, 61 Haw. 334, 603 P.2d 562 (1979); *Disciplinary Board v. Bergan*, 60 Haw.

546, 555-56, 592 P.2d 814, 819-20 (1979). In the instant case there is no doubt that Respondent has suffered for some time from alcoholism.[5]. There might exist cases in which an attorney's rehabilitation based on his timely efforts to control his alcoholism should be considered by the Board and this court as a mitigating factor. *Cf. Disciplinary Board v. Bergan, supra,* 60 Haw. at 555-56, 592 P.2d at 819-20 (including n.7). In such cases it might also be appropriate to consider past suffering and humiliation endured by the alcoholic. *Id.* However in the instant case there has been no showing of any real progress by Respondent in controlling alcoholism. Moreover, as demonstrated earlier in this opinion, Respondent's disciplinary violations are severe and extensive and include misappropriation of clients' funds; and in any such case it would be difficult if not impossible to establish sufficiently strong evidence of mitigation to warrant a penalty lesser than disbarment. In the instant case, where Respondent has failed to establish any clear mitigating factors, we are compelled to accept the Disciplinary Board's recommendation of disbarment. Accordingly, on June 12, 1981 we issued an order disbarring Respondent from the practice of law, based on the acts of misconduct summarized in this opinion.

*Daniel G. Heely,* Chief Disciplinary Counsel, and *Gerald H. Kibe,* Assistant Disciplinary Counsel, for petitioner.

*Mark D. Pettinato* for respondent.

---

[5] See notes 2-3, *supra,* and accompanying text.