497 So.2d 800 (1986)
H. Alva BRUMFIELD, III
v.
MISSISSIPPI STATE BAR ASSOCIATION.
Misc. No. 173.
Supreme Court of Mississippi.
September 10, 1986.
Rehearing Denied December 3, 1986.
*801 Nicholas Van Wiser, Rushing & Guice, Biloxi, for appellant.
Andrew J. Kilpatrick, Jr., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and SULLIVAN, JJ.
HAWKINS, Presiding Justice, for the Court:
H. Alva Brumfield, III, a Louisiana resident admitted to the Mississippi Bar, has appealed a decision of a complaint tribunal suspending him from the practice of law in this State for a period of ninety days. The Mississippi State Bar has cross-appealed complaining the conduct of Brumfield justifies disbarment.
We find no merit in Brumfield's appeal. We do find merit in the Mississippi State Bar's appeal and direct Brumfield be permanently disbarred.

FACTS
Julie Bertha Pigott Brumfield died intestate in 1964, the fee simple owner of 36 acres of land in Walthall County. In her family Mrs. Brumfield had the nickname "Dabba." She left surviving her as her sole heirs-at-law three daughters and two sons, namely: Elizabeth Brumfield Allemandi (Mrs. Allemandi), Mrs. Lucy Brumfield Handley (Mrs. Handley), Georgia Rae Brumfield Davis (Mrs. Davis), Bert C. Brumfield and H. Alva Brumfield II. Among the children Mrs. Allemandi was known as "Lib," Alva Brumfield as "Al," and Bert Brumfield as "Bert." Alva Brumfield was a practicing attorney in Baton Rouge, who died in 1974. His three children were William P. Brumfield, H. Alva Brumfield, III, and Julia Scott Brumfield Simms, who, upon his death inherited his one-fifth interest in the realty. Bert Brumfield, resident of Baton Rouge, died in January, 1979, leaving as his sole heir-at-law his widow Billie Scott Brooks Brumfield. William P. Brumfield and Alva Brumfield, III, practiced law together in Baton Rouge. Among the family Alva Brumfield, III, had the nickname "Beau."
Thus, in August, 1979, the three daughters and Bert Brumfield's widow, Mrs. Billie Brumfield, each owned an undivided one-fifth interest in the realty, and the three children of Alva Brumfield II each owned an undivided one-fifteenth interest in the land.
During their lifetimes the two sons of Mrs. Julia Brumfield apparently paid the taxes on the realty. None of the daughters had anything to do with the land.
John Clifton Barrett, Jr., was a dentist in Tylertown. On August 3, 1979, he made a telephone call not exceeding one minute to Alva Brumfield, III, and on August 6, 1979, he made a three minute telephone call to Brumfield. In one of these conversations he offered Brumfield $700 per acre for the land. Brumfield told him he would take the matter under consideration and would talk to the others interested. In his direct examination before the Tribunal, Barrett testified Brumfield told him he would "take *802 it under consideration and advise his clients." On cross-examination he conceded he was "not particularly familiar with the proper legal terminology of client or representative or whatever in this context, but I was under the impression he was representing himself and others." [Vol. II, p. 201]
On August 10 Barrett telephoned Brumfield at which time they talked for several minutes. Brumfield informed Barrett he had been unable to contact the other interested parties.
On August 6 Brumfield wrote the following letter to Mrs. Allemandi:
 August 6, 1979
 Mrs. Elizabeth B. Allemandi
 5657 Byron Nelson Drive
 Arlington, TX 78550
Dear Lib:
I received an offer for the property which Dabba owned in Walthall County in which you own a 1/5 interest for $450.00 an acre, or $3,240.00 cash.
We discussed this at the time of Bert's funeral, but I neglected to follow through on it.
I told Billie Scott I would use Al's portion to pay Bert's funeral expenses, which I will do.
I would think that we should sell the property. If this is agreeable with you, I would appreciate your calling me. I do not think my address for Lucy and Georgia Rae is good. If you could ask them and advise me, I will take care of the documentation.
I am sorry I have not written sooner but Rosemary and two of the boys have been very sick and I have been quite busy. I enjoyed your's [sic] and Paul's visit but am sorry it had to be under tragic circumstances. Let me know when ya'll are coming back through on the way to Florida and please stay overnight with us.
 Love,
 s/Beau
On August 13 Brumfield wrote Mrs. Allemandi the following letter:
 August 13, 1979
 Mrs. Elizabeth B. Allemandi
 5657 Byron Nelson Drive
 Arlington, TX 78550
Dear Lib:
Rosemary said ya'll would be through at Christmas. We may spend Christmas at Gulf Shores, but in any event, you can lay over on the beach or at the house. I enclose my check to you for $3240.00. Please take the Warranty Deed and execute the same before the appropriate notary and return to me. I don't have the right address for Lucy or Georgia Rae. If you would furnish that to me, I will forward them their documents and checks.
 Love,
 s/Beau
As he stated in the letter, he enclosed his personal check for $3,240, dated August 14, payable to Mrs. Allemandi, and proposed warranty deed for her to sign.
On August 18, 1979, Mrs. Allemandi wrote Brumfield the following letter in longhand:
Dear Beau,
I received the check and documents and will return them to you as soon as I go to an attorney. I just have one question if the sale was divided by 5  does Billie Scott get Bert's 1/5? We certainly appreciate your taking Al's share to defray Bert's funeral expenses. If Billie Scott doesn't receive that 1/5, shouldn't it be divided among the remaining heirs?
 Listed below are the addresses:
 Mrs. W.M. Handley (Lucy)
 808 Alba Drive
 Orlando, Florida 32804
 Mrs. L.L. Davis (Georgia)
 327 Rolling Hills Drive
 Conroe, Texas 77301
The Handley's [sic] are going to see Tuffy next month in Belgium. He is now a Lt. Col.
Thanks again for every thing.
 Love to all,
 s/Lib
*803 On August 27 Mrs Allemandi executed the warranty deed conveying her entire interest in the realty to Brumfield, with no reservations or exceptions, which she mailed to him.
On August 27 Brumfield wrote the following letter to Mrs. Davis:
 August 27, 1979
 Mrs. L.L. Davis
 327 Rolling Hills Drive
 Conroe, Texas 77301
Dear Georgia Rae:
I understand Lib has talked to you concerning the selling of your one-fifth interest in the land Dabba left in Mississippi. I enclose my check to you for $3,240.00 and a Warranty Deed, and I would ask that you execute the Deed before a Notary Public and then send it to me.
I get to Houston occasionally and would like to come by and see everyone. I was there several months ago and thought I saw Leroy. I went up to say hello and found out it was not him but an IRS agent who was very affronted that he was being approached and greeted on the street. I'll probably get my taxes audited as a result thereof. I certainly would like to see everyone the next time around.
 Love to all
 s/Beau
In his letter Brumfield enclosed a personal check for $3,240.00 and a proposed warranty deed. On August 30 Mrs. Handley executed the deed.
On September 24 Mrs. Billie Brooks Brumfield executed a warranty deed for her entire interest, for which she received a personal check from Brumfield dated the same date for $1,027.68. In this payment Brumfield deducted Bert Brumfield's funeral expenses due Ravenhorst Funeral Home in Baton Rouge in the amount of $2,212.32, which he had paid by check dated August 22, 1979.
Just as in Mrs. Allemandi's warranty deed, the others conveyed their entire interest in the realty with no reservations or exceptions. All deeds were filed for public record in the chancery clerk's office of Walthall County on September 26, 1979.
On October 16, 1979, Brumfield executed an oil and gas lease on the realty to B.P. Tillery of Laurel, for the bonus rental of $500 per acre. On the same date his sister and brother likewise each executed an oil and gas lease to Tillery. Preceding in the execution of these leases there had been telephone conversations between Tillery and Brumfield.
On November 30, 1979, following his employment to make an appraisal of the property by Brumfield, Doug Rushing of Tylertown wrote Brumfield the land was worth $1,000 per acre, including the timber thereon, which he valued at $16,000.
Mrs. Allemandi and her husband Paul had their suspicion aroused, so their Texas attorney contacted Dan Wise, attorney in Hattiesburg. Wise made an investigation, contacted Tillery, and on November 13, 1979, filed a bill of complaint on behalf of Mrs. Allemandi and Mrs. Handley in the chancery court of Walthall County to set aside the deeds of Brumfield, establish a constructive trust between Brumfield and the grantors as to any oil and gas proceeds, and for an accounting. On November 29, 1979, an amended bill was filed by all three sisters, asking for the same relief as the original bill. Both bills charged Brumfield with fraud in procuring the deeds.
Prior to trial all the grantors tendered the purchase price Brumfield had paid them for the land.
Following a trial, the chancellor rendered a final decree on November 17, 1981, finding there was a fiduciary relationship between Brumfield and the four grantors, and that he had defrauded them, and directing that Brumfield reconvey the interest acquired from the three sisters and Mrs. Billie Brooks Brumfield back to them, and awarded judgment to each of them against Brumfield for $3,600.00 totaling $14,400, the amount Brumfield had received in bonus rental under the oil and gas lease for their interest.
*804 Brumfield appealed to this Court, and we affirmed without an opinion on September 7, 1983.
On July 11, 1984, the Mississippi State Bar filed a complaint against Brumfield. Although Brumfield is a Louisiana citizen, he held a license to practice law in Mississippi, and was a member of this State's Bar.
The complaint charged violation of Disciplinary Rules of the Code of Professional Conduct DR 1-102 (A)(1, 4 and 6) in engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, or other conduct adversely affecting his fitness to practice law.
Brumfield answered August 3, 1984, attaching as exhibits portions of the depositions of Mrs. Allemandi, Mrs. Handley, Mrs. Davis and Mrs. Billie Brumfield given in the previous trial.
On November 2, 1984, Brumfield filed a motion in limine to exclude the appeal record in the chancery court case between him and his aunts, and to exclude the depositions of the aunts, given in preparation of trial in the chancery court.
In the argument on the motion, complaints counsel responded that he had no subpoena powers, that he could not compel the aunts to testify, that he had talked with Mrs. Brumfield and Mrs. Handley, who did not want to give any deposition.
The Tribunal was of the opinion Miss. Code Ann. § 13-1-111 (1972) did not authorize the use of the depositions. After considerable argument, the Tribunal did rule that Miss. Code Ann. § 99-9-33 authorized the Tribunal to compel these witnesses to attend the hearing, and directed complaints counsel to prepare an order securing their attendance on December 17.
Brumfield's counsel filed a written objection to this procedure. Brumfield also filed a petition in this Court for a writ of prohibition to prevent compelling the attendance of these witnesses, which we denied December 12.
Prior to hearing, however, the Tribunal ruled that the Bar could introduce the prior testimony from the chancery court suit.
At the hearing Barrett and Dan Wise, the attorney who represented the aunts, testified, and the Bar introduced excerpts from the prior testimony of Mrs. Allemandi, Mrs. Davis, Mrs. Handley and Mrs. Billie Brumfield taken from the chancery court trial transcript. In his defense Brumfield and John Jeffries, an attorney from Laurel, testified. Jeffries is a lifelong friend of Brumfield's and one of the authorities who represented Brumfield in the chancellory court action.
Brumfield said he had never represented his aunts in any professional capacity, and there was virtually no family relationship between these heirs. He said that he had never seen the land in Walthall County, denied that Barrett offered $700 per acre, and claimed he had only been offered $450 per acre.
Brumfield testified that when his uncle Bert Brumfield died, his wife Billie Scott was an alcoholic, and did not make funeral arrangements. So Brumfield made the arrangements and guaranteed payment of the bill. He said that at the funeral he had discussed payment of the funeral bill with Mrs. Brumfield and Mrs. Allemandi. He claimed they reached an understanding that the land in Tylertown would be used to pay the bill, first using Brumfield's and his brother's portion, and if that did not cover it, then whatever share Bert received would make up the difference.
Brumfield testified that following receipt of the offer from Barrett he communicated it to Mrs. Allemandi. He further testified that when he discussed the sale with his sister, Mrs. Julia Simms and her husband, he learned that Mr. Simms was having some trouble with the Internal Revenue Service and she did not want to sell at that time. According to Brumfield, he reported this to Barrett, who got quite upset, and told Brumfield he did not want to purchase the land unless he could get it all. Brumfield said he told Barrett the problem was only temporary, and that his sister would *805 be able to sell in a short while, but this did not satisfy Barrett.
Brumfield further related that Mrs. Allemandi's husband Paul was an alcoholic who stayed intoxicated and had lost his job. Following Brumfield's communication of Barrett's offer to Mrs. Allemandi, Brumfield claimed that Paul kept after him to sell the land so they could get some money. Because of this, Brumfield said he went ahead and bought the land himself to relieve the financial plight of the Allemandis, and he paid the heirs.
Brumfield testified that he had made a check payable to Mrs. Billie Scott Brumfield for her full share, $3,240, but when she came in on September 4 to sign the deed and get the check she was so drunk she threw up and could not sign her name.
According to Brumfield, Mrs. Brumfield came back on September 24 and told him:
Beau, it's not fair that you pay the funeral home and give me mine. You are out of that money. Wait and give me mine when you get it all back from Dr. Barrett. No, it's not fair to you."
He testified that was why he then gave her a check for $1,027.68, which was her share less the funeral bill.
Brumfield testified his intention was to purchase the land for the benefit of all the heirs, but because of a threat from Wise he kept it. He testified (R. 438):
Because Mr. Dan Wise told my attorneys that if I didn't settle that lawsuit he would get me through the Mississippi State Bar Association and disbar me. I took that as a personal and professional affront, and a statement from a blackmailer and a person that I would not trust, and I would not enter into any negotiations, personally or professionally, once a threat like that had been made. I felt my hands were completely tied. I could not compromise my personal standards or professional standards in dealing with that type of person.
As to the alleged threat, Jeffries testified:
Q. Were any conditions placed upon settlement or not settling that case by Wise?
A. I wouldn't call it conditions; I'd refer to it as a direct threat. He said if Beau does not settle the lawsuit and we win it, I will see he has trouble with the Bar.
As to any settlement negotiations and statements, Wise had testified:
Q. Did you have any settlement discussions with either Mr. Brumfield or John Jeffries during the pendency of this lawsuit?
A. There was an offer made after the suit was filed. I can't recall if it was with Mr. Jeffries or with you (Billy Guice); but there was a discussion of allowing  or requesting Mr. Brumfield to reconvey the property to my clients and allowing him to keep the net bonus money from the oil company so that they would be made whole and have their property back and ratify the leases, have him step out of the position of the leases, let them step into his shoes in the lease, and let him keep the 18,000 that they had paid him; but that wasn't done. That's my recollection, and I can't recall whether you and I had that discussion or Mr. Jeffries.
MR. KILPATRICK (COMPLAINT COUNSEL): Would you restate that? I didn't  I don't believe I understood.
A. All right. The settlement offer that was made was for Mr. Brumfield to keep the $18,000 net per acre bonus money that was paid to him by the Pruet Production Company, and he was to reconvey fee simple title in this property back to his aunts. They would then ratify the leases and step into his shoes; and if the well were a good well, they would receive  I don't know if you'd say royalty. I don't do much oil and gas work  they would receive the proceeds from the well, if any; and they would be back in fees position of the *806 timber, minerals, and the land. Mr. Brumfield would have maintained and kept the $18,000 net bonus that he had received from Pruet, and of course he would still have been a one-fifteenth owner with his sister and his brother William.
* * * * * *
A. That's correct. They were willing to let him keep the $18,000 that he had received from Pruet.
* * * * * *
Q. (Continuing by Mr. Guice) During the settlement discussions, do you recall discussing with Mr. Jeffries that if the case wasn't settled, a complaint would be filed with the Bar Association?
A. No, I don't; but I wouldn't deny doing it. I told Mr. Jeffries, you know, early on in the case that I thought the case ought to be settled and that I thought Mr. Brumfield had some problems in that standpoint; but I do not recall any statement that if it was not settled, there would be a complaint filed; but I do recall discussing with him that I felt like perhaps things hadn't been done like they should have been done. I wouldn't deny at all having discussed the possibility of a complaint.
On January 24, 1985, the Tribunal concluded that there was a confidential or fiduciary relationship between Brumfield and his aunts, and while there was no attorney-client relationship, he was still under an obligation not to commit the acts he had. The Tribunal concluded Brumfield had breached that duty and was guilty of violating DR 1-102(A) (1, 4 and 6) of the Code of Professional Responsibility.
The judgment of the Tribunal was that Brumfield should be suspended from the practice of law for ninety (90) days.
Brumfield has appealed, assigning several errors. The Bar has cross-appealed assigning the Tribunal erred in not disbarring him.

LAW
Brumfield was charged with violating the following Disciplinary Rules of the Code of Professional Responsibility of the Mississippi State Bar:
DR 1-102. MISCONDUCT
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule
* * * * * *
(2) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
* * * * * *
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
In attorney discipline cases we do not sit simply as an appellate court. Not only do we review the findings and conclusions of the Complaint Tribunal, but we review all the evidence and law, following which we make such findings and conclusions of law as we find appropriate, based upon the whole record. Miss. Code Ann. § 73-3-329 (5); Rule 9.4 of Rules of Discipline Mississippi State Bar; Mississippi State Bar Assoc. v. Strickland, 492 So.2d 567 (1986); Clark v. Mississippi State Bar, 471 So.2d 352, 357 (Miss. 1985); Levi v. Mississippi State Bar, 436 So.2d 781, 783 (Miss. 1983); Mississippi State Bar v. Phillips, 385 So.2d 943, 944 (Miss. 1980); Bramlett v. Burgin, 382 So.2d 284, 285 (Miss. 1979).
We agree with the findings and conclusions of the law of the Tribunal that there was a fiduciary relationship between Brumfield and his aunts, and he was under a positive duty not to commit the acts he did, and that he violated the above rules of discipline. We find as a fact that Brumfield did engage in conduct involving dishonesty, fraud, deceit and misrepresentation, and conduct that adversely reflected upon his fitness to practice law.
Brumfield first assigns as error that the Tribunal erred in admitting testimony of his aunts from the chancery court action. While it appears Brumfield waived any objection thereto when he made as exhibits to *807 his own answer portions of their testimony from the chancery court trial. 31A C.J.S. Evidence, § 376 (1964); Griffith, Mississippi Chancery Practice, § 572 (2nd ed. 1950); McCormick, Evidence, § 260 (3rd ed. 1984). We need not to address this question because we find, aside from this testimony, that the record shows by clear and convincing evidence that he violated the above disciplinary rules.
The next three assignments of error go to the sufficiency of the evidence. Brumfield asserts that there was no attorney-client relationship and an attorney should not be disciplined for conduct outside his professional capacity; there was no clear and convincing proof of misconduct; and finally, the Tribunal erred as a matter of law in concluding there was a fiduciary relationship. We will address these assignments together.
It is clear that Brumfield acted on behalf of his aunts as their agent. The letters he wrote his aunts and his own testimony clearly establish that he purported and ostensibly undertook to act for everyone's common benefit. His duty to his aunts under the facts of this case was no different than an attorney to his client. In Van Zandt v. Van Zandt, 227 Miss, 528, 86 So.2d 466, 470 (1956), we stated:
... the relationship of principal and agent, being confidential and fiduciary in character, demands of the agent the utmost loyalty and good faith to his principal. Any breach of this good faith whereby the principal suffers any disadvantage and the agent reaps any benefit is a fraud for which the agent will be held accountable, either in damages or by judgment precluding the agent from taking or retaining the benefits so obtained.

BRUMFIELD'S MISCONDUCT
We find the proof clear and unequivocal that Barnett offered Brumfield $700 per acre. We accept that finding of fact by the Tribunal, as the chancellor undoubtedly found in the chancery court cause. Brumfield represented to his aunts that he was offered $450 per acre by a third party, this was $250 an acre less than the actual offer. He thus acquired their four-fifths undivided interest in the 36 acres worth $20,160 for $12,960, thereby cheating them out of $7,200. All this aside the very suspicious circumstance indicates that Brumfield probably knew the land was worth far more than $700 an acre.
Brumfield conceded, as he had to, that shortly after he acquired his aunts' deeds he unquestionably knew the land was worth far more than $700 an acre. His excuse for not doing the honorable thing and reconveying his aunts' interest back to them was a threat by Wise made to Jeffries that disciplinary action would be instituted against him through the Mississippi State Bar.
We find nothing in Jeffries account of his conversation with Wise that showed any impropriety whatever by Wise. Even if there were, this is no justification whatever for Brumfield's refusal to take the only honorable step remaining for him after he had defrauded his aunts as he had: to reconvey their interest in the land to them, and pay them their proportionate share of the oil and gas bonus rental.
Nor do we find the reason he gave for not paying the funeral bill of his uncle's funeral out of his share, as he had promised Mrs. Allemandi to do, the least persuasive.
Regardless of this, Brumfield argues, because there was no attorney-client relationship between himself and his aunts, he is not subject to discipline. Brumfield overlooks the plain reading of DR 102 which specifically proscribes any conduct involving dishonesty, fraud, deceit, or misrepresentation, or in any other conduct that adversely reflects on his fitness to practice law.
Integrity, honor and scrupulously fair dealing are the hallmarks of an attorney. What Brumfield did in this case was particularly relevant as to his fitness to practice law. Attorneys must be totally honest when handling their clients' affairs. That an attorney could do what Brumfield did to *808 his own aunts, even though he may have had but slight acquaintance with some of them, evinces a dishonesty which varies completely with the integrity basic to the practice of law. We reject his contention that the boundary line of disciplining an attorney begins with the attorney-client relationship.
As we stated in Rhodes v. Rhodes, 420 So.2d 759, 761 (Miss. 1982), an attorney should not be disciplined for misconduct out of his professional capacity unless such misconduct is of a serious nature, and tends to show him an unfit person to be an attorney. Brumfield's conduct does show him unfit to practice law.
We also stated in Levi v. Mississippi State Bar, 436 So.2d 781, 786 (Miss. 1983), that the disciplinary rules:
... were not adopted solely for the protection of clients. They were adopted as part of the effort of the Supreme Court to maintain the highest standards of professional conduct by the members of the Bar in all facets of their professional life.
We adopt the holding of the Disciplinary Board of the Hawaii Supreme Court v. Bergan, 60 Hawaii 546, 592 P.2d 814, 818 (1979):
It is the solemn duty of this court to regulate the practice of law in this state and to see that the integrity of the profession is maintained by disciplining attorneys who indulge in practices inconsistent with the high ethical standards demanded of all members of the bar... . In carrying out this duty, we will not hesitate to impose substantial sanctions upon an attorney for any act  whether committed in a professional capacity or not  which evinces want of personal honesty and integrity or renders such attorney unworthy of public confidence.
And also In re Goldman, 179 Mont. 526, 588 P.2d 964, 978 (1978):
Any acts committed by an attorney, contrary to the highest standards of honesty, justice, or morality .. . whether committed in his capacity as attorney, or otherwise, may constitute cause for discipline.
As suggested in Rhodes v. Rhodes, supra, we realize lawyers are human and possess the frailties of the human character. While there may be qualities about particular attorneys which individual judges could not approve or condone, these flaws do not involve dishonesty or some conduct that adversely reflects upon his fitness to practice law.
On the other hand, conduct which adversely reflects upon an attorney's fitness to fulfill the obligations of our profession is subject to discipline whether the attorney was acting in a professional capacity or not. We must add that this Court, not the offending lawyer, will determine whether an attorney's conduct adversely affects his fitness to practice law.
Typically attorneys are entrusted with the money and property of others. The care and safekeeping of this property is a customary responsibility for a practicing attorney.
We cannot envision a more inappropriate person to fulfill such obligation than a man who swindled innocent persons out of their property.
In summary, we find that Brumfield, while acting in a representative and fiduciary capacity which he had undertaken, deliberately cheated and defrauded his aunts, and this conduct was a clear and convincing violation of DR 1-102(A) (1, 4 and 6), subjecting him to appropriate discipline by the Bar.

CROSS-APPEAL
In its cross-appeal the State Bar contends the complaint tribunal should have disbarred Brumfield. We agree.
The misconduct of Brumfield, his dishonesty and deceit, was of such magnitude that disbarment is justified.
Moreover, we find a dismaying absence of contrition on the part of Brumfield, no recognition whatever by him of any wrong-doing.
It will therefore be the judgment of this Court that Brumfield be permanently disbarred *809 from the practice of law in this State.
COMPLAINT TRIBUNAL'S FINDING FOR DISCIPLINARY ACTION AFFIRMED, COMPLAINT TRIBUNAL'S 90-DAY SUSPENSION REVERSED, AND CROSS-APPEAL FOR PERMANENT DISBARMENT AFFIRMED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.