91 P.3d 1078 (2004)
104 Hawai`i 435
In the Matter of the Application of W.D.P. for Admission to the Bar of the State of Hawai`i.
No. 26494.
Supreme Court of Hawai`i.
June 16, 2004.
MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.
PER CURIAM.
Bar Applicant W.D.P. (Applicant or Petitioner) timely petitioned for review of a Board of Bar Examiners' hearing panel's recommendation to deny Petitioner's requests to sit for the Hawai`i bar examination and for admission to the Hawai`i bar. See Hawai`i Board of Bar Examiners Rules of Procedure (HBBE) § 4.4;[1] Rule 1.3(e)[2] of the Rules of the Supreme Court of the State of Hawai`i (RSCH). We deny Petitioner's request to sit for the Hawai`i bar examination and his Application for Admission to the Hawai`i Bar.

I. BACKGROUND

Petitioner submitted an application for admission to the Hawai`i bar on April 23, 2002. Petitioner received his law degree from the University of Missouri at Kansas City in May 1980. Petitioner is licensed to practice law in Missouri, before the United States District *1079 Court for the Western District of Missouri, and before the United States Court of Appeals for the Eighth Circuit. At the time of his application, Petitioner was in good standing with the Missouri Bar.
Petitioner reported that he was suspended from the Missouri and federal bars from April 1998 to December 2001. Petitioner reported the suspension resulted from convictions on three felony counts, that the Kansas Supreme Court reversed the convictions and remanded the case for new trial, and that the State of Kansas dismissed the criminal charges upon remand.
Concerning the three felony convictions, the record shows that in 1995 and 1997 Petitioner was charged and recharged with three counts of "unlawfully, knowingly, willingly, and feloniously engag[ing] in lewd fondling or touching of a person under eighteen years of age" in violation of Kansas Statutes Annotated (K.S.A.) §§ 21-3603[3] and 21-4501(d).[4] Count 1 concerned Petitioner's adopted daughter, the daughter of Petitioner's second wife; Counts 2 and 3 concerned the daughter of Petitioner's third and current wife. The acts were alleged to have occurred in 1991, 1992, and 1993 respectively. A jury found Petitioner guilty of all three counts in 1998.
Petitioner also reported a 1991 charge of aggravated battery against a law enforcement officer. The record shows that the officer was serving a "protection from abuse" order when the event occurred. Prosecution on the aggravated battery charge was deferred by Petitioner's agreement to enter a diversion program. One of the conditions of the diversion was "enrollment in a drug education program and/or anger control counseling or treatment." Petitioner complied with the diversion conditions and the case was dismissed in September 1992.
*1080 When Petitioner submitted his Hawai`i bar application, Petitioner was reinstated to practice before the Missouri state courts and the United States Court of Appeals for the Eighth Circuit, but had not been reinstated to practice before the United States District Court for the Western District of Missouri.
In addition to the disciplinary and criminal matters, Petitioner reported credit revocations, loan defaults, a number of civil suits for non-payment of debts, and voluntary chapter 7 bankruptcies filed in 1985 and 1993.[5]
By letter dated May 30, 2002, the Board of Examiners notified Petitioner that it recommended denial of the application because Petitioner had not been readmitted to practice before the United States District Court for the Western District of Missouri. The Board also told Petitioner that it had "serious concerns" about "the underlying facts of the [criminal] charges" that led to the suspension of Petitioner's licenses to practice law.
By order dated May 29, 2002, we denied Petitioner's application for admission to the bar. The order was entered without prejudice to reapplication after reinstatement in the United States District Court for the Western District of Missouri and "a complete and full investigation of [Petitioner's] application to determine whether he satisfies the character and fitness requirements for admission as set forth in Rule 1.3(c), RSCH."
Petitioner moved for reconsideration. We granted the motion to the extent that Petitioner was allowed to update his application rather than reapply. After Petitioner was reinstated to practice before the United States District Court for the Western District of Missouri and updated his application, the Board advised Petitioner that it was inclined to recommend that his application be denied due to Petitioner's failures to pay debts, Petitioner's actions that resulted in the charge of aggravated battery, and Petitioner's convictions for aggravated incest. The Board acknowledged that the three incest convictions had been reversed due to trial error, but said that "the substance of the complaints raise[d] serious concerns" about Petitioner's character and fitness.
Petitioner asked for a formal hearing. See HBBE § 2.12.[6] A hearing panel was appointed, and a hearing was held on January 27, 2004. Testimony was taken from Petitioner and Petitioner's witnesses.[7]
Following the hearing, the hearing panel entered findings and conclusions. The hearing panel's findings acknowledged that the incest convictions were overturned on appeal, but observed that convictions concerning one daughter might "have been sustained" had the charges not been joined with charges concerning the other daughter. The hearing panel discounted testimony from Petitioner's character witnesses. The panel explained that the character witnesses had known Petitioner for less than two years and observed that it was not clear the witnesses were fully informed about the criminal charges against Petitioner. The panel found Petitioner's explanation concerning the charge of aggravated battery against a law enforcement officer was "not credible." The panel found "no satisfactory explanation" concerning "why [Petitioner] allowed ... default judgments to be entered against him."
The panel concluded that Petitioner had not proven a record of conduct that would justify the trust of clients, adversaries, *1081 courts, and others with respect to the professional duties owed to them. The hearing panel's findings and conclusions were provided to Petitioner and forwarded to this court by the Board Chair. The forwarding letter indicates that the Board of Examiners agrees with the hearing panel's findings and conclusions and recommends that Petitioner's application for admission to the Hawai`i bar be denied.
Petitioner petitioned for review. Additional information is set out below where necessary.

II. ISSUE

The issue posed by the petition for review is whether Petitioner has met his burden of proving good character by a record of conduct that would justify the trust of clients, adversaries, courts, and others with respect to Petitioner's professional responsibilities. RSCH 1.3(c).

III. STANDARD OF REVIEW

Subject to the distinction that the burden of proof in an application proceeding is upon the applicant, RSCH 1.3(c)(2), bar admission and bar discipline matters are reviewed under the same standard, i.e., de novo. Cf., e.g., In re Trask, 46 Haw. 404, 415, 380 P.2d 751, 758 (1963) ("The power to regulate the admission and disbarment or disciplining of attorneys is judicial in nature and is inherent in the courts."); Office of Disciplinary Counsel v. Lau, 79 Hawai`i 201, 204, 900 P.2d 777, 780 (1995) ("As the ultimate trier of both fact and law in cases involving the discipline of attorneys, ... we are not bound by the findings of the [Disciplinary] Board or by its hearing committee and will independently consider all testimony and evidence in the record.... In short, we review such cases de novo." (Citations omitted.)); Disciplinary Bd. of Hawaii Supreme Court v. Bergan, 60 Haw. 546, 554-55, 592 P.2d 814, 819 (1979) ("As between the reports of the Disciplinary Board and its hearing committee, the factual findings contained in the report of the latter whose members have had a first-hand opportunity to observe and assess the credibility of the witnesses are entitled to greater weight than the factual findings contained in the report of the former. However, the Board's recommendation as to discipline should be accorded greater weight than the committee's recommendation.... In any event, we are not bound by the findings and recommendations of either the Board or its committee and, in determining the sanction to be imposed, we will independently consider all the testimony and evidence in the record." (Citations omitted.)); Cf. In re Vanderperren, 261 Wis.2d 150, 661 N.W.2d 27, 29 (2003) ("The duty to examine applicants' qualifications for bar admission rests initially on the Board, and this court relies heavily on the Board's investigation and evaluation; however, this court retains supervisory authority and has the ultimate responsibility for regulating admission to the... bar.") (Citation omitted.); In re Covington, 334 Or. 376, 50 P.3d 233, 233 (Or.2002) ("This court reviews de novo." (Citations omitted.)); In re McMillian, 210 W.Va. 265, 557 S.E.2d 319, 321 (2001) ("This court reviews de novo the adjudicatory record made before the ... Board of Law Examiners with regard to questions of law, questions of application of the law to the facts, and questions of whether an applicant should or should not be admitted to the practice of law. Although this court gives respectful consideration to the Board of Law Examiners' recommendations, it ultimately exercises its own independent judgment. On the other hand, this Court gives substantial deference to the Board of Law Examiners' findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record ." (Citations omitted.)); In re Krule, 194 Ill.2d 109, 251 Ill.Dec. 665, 741 N.E.2d 259, 260 (2000) ("[T]he final judgment regarding admission of an applicant to the practice of law rests with this court. As a general rule, a determination by the Committee on Character and Fitness concerning the character and fitness of an applicant neither binds this court nor limits our authority to take action.... [W]here a hearing panel concludes that a petitioner does not possess the good moral character and general fitness necessary for the practice of law and recommends that certification be denied[,]... this court will not reverse unless *1082 that recommendation was arbitrary." (Citations omitted.)).
We keep in mind that "[a] certificate of admission to the bar is a representation made by this court that the possessor is worthy of the confidence of clients entrusting their interests to his care." See Akinaka v. Disciplinary Board, 91 Hawai`i 51, 55, 979 P.2d 1077, 1081 (1999) (quoting Disciplinary Board v. Kim, 59 Haw. 449, 455, 583 P.2d 333, 337 (1978), that in turn quoted In re Melnick, 383 Ill. 200, 48 N.E.2d 935, 938 (1943), quoting Chicago Bar Ass'n v. Meyerovitz, 278 Ill. 356, 116 N.E. 189, 193 (1917)).
Our rules provide examples of factors to be considered when considering evidence of character and fitness. RSCH 1.3(c) provides:

(c) Good Character and Fitness.
(1) Standard of Character and Fitness. A lawyer should be one whose record of conduct justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them. A record manifesting a deficiency in:
(i) honesty,
(ii) trustworthiness,
(iii) diligence,
(iv) reliability,
(v) financial responsibility,
(vi) professional responsibility, or
(vii) respect for the law shall be grounds for denying an application.
(2) The burden of proving good character and fitness is on the applicant.
HBBE § 2.6(c) provides:
(c) The following factors, among others, adversely reflect on an applicant's character and fitness to practice law and may constitute cause for additional inquiry or a recommendation to deny the application:
(1) unlawful conduct;
(2) academic misconduct;
(3) false statements;
(4) relevant and material omissions;
(5) misconduct in employment;
(6) acts involving, dishonesty, fraud, deceit, or misrepresentation;
(7) abuse of legal process;
(8) neglect of professional obligations;
(9) violation of a court order;
(10) denial of admission in another jurisdiction on character or fitness grounds;
(11) legal or professional disciplinary action in any jurisdiction;
(12) failure to conform conduct to the requirements of the law;
(13) a pattern of offenses, even ones of minor significance indicating indifference to legal obligation; and
(14) financial irresponsibility.

IV. CONTENTIONS[8]AND DISCUSSION

A. The Incest Charges and Reversed Convictions

Petitioner "concurs with" the findings set out in paragraphs 1 through 25 of the hearing panel's findings and conclusions.[9] Petitioner opines that the hearing panel was wrong to find, in paragraph 26,[10] that "there is nothing in the trial record that shows Applicant was falsely accused" of the incest offenses. Petitioner asserts that "[t]he unanimous Kansas Supreme Court decision, the *1083 trial transcripts and motions and memoranda filed in the case are replete with evidence that clearly and convincing [sic] show [he] was innocent of all charges brought and was wrongfully tried and convicted."
The Kansas Supreme Court's opinion supports Petitioner's assertion that he was wrongly convicted, but lends no support to Petitioner's statement that "the case [is] replete with evidence that clearly and convincing [sic] show [he] was innocent of all charges brought and was wrongfully tried[.]" The Kansas Supreme Court characterized the evidence against Petitioner as "not overwhelming" and noted that the "credibility of the [daughters'] testimony is the State's case," but the Kansas Supreme Court did not say Petitioner was innocent or that the evidence was insufficient. Indeed, the Kansas Supreme Court remanded the case for a new trial.
Petitioner does not identify any part of the trial record to support his assertion that "the case [is] replete with evidence that clearly and convincing [sic] show [he] was innocent of all charges brought[.]"
A favorable resolution of a criminal proceeding does not preclude consideration of the criminal accusation and evidence in support of it when the Board of Examiners and this court are reviewing a bar application. On this subject, the Oregon Supreme Court said, for example:
Of course, an arrest or a charge ending in dismissal does not establish that the accused committed the prohibited act.... As the United States Supreme Court has said:
"The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense."
... On the other hand, dismissal does not preclude inquiry to ascertain whether an offense was committed. We recently considered a similar question in a proceeding concerning the conduct of a judge ...[.] There, criminal charges had been filed and later dismissed. The judge argued that the dismissal precluded our consideration of the charges. We rejected this contention, concluding that it was our duty to determine whether or not the accused had violated the law, regardless of whether criminal charges had been filed.
"Had no criminal prosecution ever been instituted in connection with the judge's conduct brought to our attention by this record, we should still inquire whether he failed to comply with the criminal law."
....
Similarly, in this case, the trial court's dismissal of the charges in no way bars our examination of the underlying events.
"[A]cquittal in a criminal action cannot be deemed to be res judicata here upon any issue, for the purpose and scope of an inquiry to determine an applicant's character and fitness to become a member of the Bar are essentially different. * * * Conduct not descending to the level of guilt of the violation of a criminal statute may well present an insuperable obstacle to admission to the Bar if such conduct evinces a lack of that `character and general fitness requisite for an attorney and counselor-at-law.'"
In re Taylor, 293 Or. 285, 647 P.2d 462, 463-64 (1982) (citations omitted).
Petitioner's convictions were vacated, but the evidence was sufficient to remand for new trial. Petitioner has not shown why the charges were dismissed, and, to that extent, Petitioner has failed to address his burden of proving good character.
In any event, the record requires denial of the application on other grounds, as set out below.

B. Characterization of a Police Report

Petitioner says the hearing panel erred when it found in paragraph 27[11] that he *1084 "informed police ... an adult female ... accused [him] of a sexual assault[.]" Petitioner urges that the police report actually says that the woman, "in a dispute over a bill," actually "stated if she didn't get her money back she would accuse [him] of sexual abuse." "[N]o accusation was ever made[,]" Petitioner says, nor was he questioned about the subject by the panel.
A January 9, 1995 report by a Detective K. Joseph Langer about Petitioner's police "interview" during the investigation of his adopted daughter's sexual assault accusation says, in relevant part:
I then asked [Petitioner] if there were any other claims of sexual abuse against him in his past. He said that when he was the owner of ... a customer came in and stated she wanted her money back. [Petitioner] said he refused to refund the money. [Petitioner] said at that time the customer said she would claim sex abuse against [Petitioner]. [Petitioner] said he refunded the money to her. [Petitioner] said he does not know if the woman made a police report. He said he was never charged and this incident would have occurred between 1990 and 1992.
On this point, Petitioner's characterization of the police report is more accurate than the hearing panel's finding.[12]

C. Character Evidence Evaluation

Panel finding 28,[13] Petitioner notes, questions whether Petitioner's character witnesses were informed about all of the charges against him. Petitioner says that the panel "did not exercise its ability to ask any questions ... of [his] witnesses to resolve... concerns or doubts ... concerning his good moral character." Petitioner asserts that the panel "apparently completely disregarded ... favorable recommendations from long-time acquaintances" that included "[National Conference of Bar Examiners (]NCBE[)] letters of recommendation" and letters from his in-laws, the grandparents of one of the complaining witnesses.
The hearing panel's findings address only the testimony given by character witnesses called by Petitioner "at the [January 27, 2004] hearing." The panel's findings do not specifically indicate whether the committee reviewed the NCBE character reports from the individuals Petitioner had listed in his application. The NCBE references were, presumably, reviewed before the Board first indicated that it would recommend denying Petitioner's application. Thus, it appears that any favorable character references did not outweigh the concerns that formed the basis of the Board's recommendation to deny the application. The hearing was Petitioner's opportunity to present additional character or other evidence, and he did so. The hearing panel's characterization of the live testimony is not necessarily a discounting of the previously submitted references; it is merely an indication of the weight the panel attributed to the live witnesses who Petitioner presented at the hearing.[14]
*1085 A rational fact-finder could reach the conclusions reached by the hearing panel, i.e. that Petitioner's hearing witnesses had not known him long enough for their character testimony to be given much weight.
Insofar as the lack of panel questions is concerned, the proceeding provided by RSCH Rule 1.3(d)[15] and HBBE §§ 2.5[16] and 2.6[17] is not generally an adversarial proceeding. The proceeding is held at the request of *1086 the applicant and is an opportunity for an applicant to meet the burden of proving good character. Although a hearing panel is authorized to inquire further, it is not mandated to do so.[18]

D. Credibility Concerning an Aggravated Battery Charge

Petitioner disagrees with panel finding 29[19] that Petitioner's explanation of a 1991 aggravated battery charge was not credible. Petitioner opines that his explanation is consistent with police reports. Petitioner says that the panel did not question him about the incident.
Petitioner was charged in Kansas with "unlawfully, feloniously and willfully touch[ing] or apply[ing] force to the person of another ... with the intent to injure that person and which was done with a deadly weapon, to wit: an automobile or which was done in a manner whereby great bodily harm, disfigurement, dismemberment or death could have been inflicted, in violation of K.S.A. [§] 21-3414 and K.S.A. [§] 21-4501(c)." As previously noted, prosecution was deferred, and Petitioner entered a diversionary program.
The police officers' accounts of the incident said, in sum, that they were assigned to serve a "protection from abuse order," that when Petitioner drove into a driveway and got out of the car one of the officers drove in behind Petitioner, and that Petitioner ran back to and reentered his car and reversed the car toward the officer. The officer jumped onto the hood of the officer's car, but the officer's left foot was momentarily pinned between the bumpers of the two cars.
On his application Petitioner described the incident thus:
I was dropping off my daughter's overnight bag at my estranged wife's residence when I was rapidly approached by two men unknown to me. Believing that I was in immediate danger I attempted to flee and during that attempt accidently bumped one of the men chasing me with my automobile. The men then drew guns and pointed them at me and identified themselves as County Deputies. I complied with their directions and was immediately arrested and charged with aggregated [sic] battery against a LEO.[[20]]
Petitioner's explanation at the hearing was lengthier and varied to some extent:
The 1991 charge for Aggravated Battery I think needs to be explained in the context of some surrounding circumstances. In late January 1991, I moved out of our family home after discovering that my wife at the time ... was having an affair. That was the end of January 1991. On February 18th, 1991, while [wife] was at work at Johnson County Community College, I used my house key and entered the home with the intention of retrieving a fish tank, some clothing, and some other personal items that I still had in the house, thought the best time to do that, since it was a very emotional time for both of us, was when she was not there.
So I entered the house, and I heard the alarm beeping. I went over to the keypad to disarm it, and she had changed the code, so I knew the alarm was going to go off. I also knew that it was a monitored system so that the police would be summoned in a very short period of time, so I simply waited for them. They arrived. I showed them my ID. They asked me what I was doing there. I explained the situation, and they were fine with it. They said, "Get your stuff, do what you need to do, and leave," and so I did that. The police left.
While I was there, the phone rang and I answered it, and it was my wife at the time, my ex-wife now, on the phone. She *1087 was very irate that I was in the house, although we had no formal separation agreement or anything, I'd simply moved out, there was no divorce pending at that time or anything, sobut anyway, she was irate. She accused me of spying on her and digging into her personal affairs and activities, and she ended it by saying that she was going to have my ass kicked, specifically those words.
Later that evening, I had my daughter, our daughter, over for overnight visitation, and prior to going to bed that night, she had karate class. I took her to karate, and when we were talking, she said, "Oh, mom's new boyfriend has a black belt in karate," and so I thought, okay, well, I made a little mental note of that.
The next morning, I went over to drop I dropped my daughter at the elementary school, and then I went by the house to drop off her overnight bag to my ex. As I drove into the driveway, I got out of the car, parked it, started walking up the walkway, and two cars from different directions descended on me. The men, two different men, jumped out of the car, and although they didn't run, they were approaching me in a rapid fashion. I remembered the threat from the day before and thought she was making good on it.
So what I did at that point was I ran back to the car, locked the door, and I was, since I was blocked in, I was going to try and drive through the grass to get out of harm's way. The first gear that hitit was an automaticwas reverse. The car jerked back a couple of feet, and one of the men was between the two cars at the that time. He saw the car lurch back and jumped up on the hood of his vehicle, and I momentarily pinned his foot between the two vehicles. Fortunately for all of us, the car had a polyurethane rear bumper. He was not injured.
At that point, I managed to get the car into first gear and started to make a turn to get out. He jumped off the hood of his car into my path, drew a gun, and leveled it at me through the windshield. At that point, he identified himself as with thehe was a county deputy with the Sheriff's Department, so I was relieved that it was not the situation that I thought. He ordered me out of the car. I put the car into park, immediately got out of the car, did not resist. I was immediately placed under arrest, and the subsequent charges of Aggravated Battery against an LEO were filed.
Actually, the charges that were actually filed were Aggravated Battery instead of Aggravated Battery against an LEO supposedly because they had notthey realized that nobody had identified themselves prior to the time that they leveled a gun at me. After the situation was explained, they still were not willing to drop the charges at that point but the case was referred for diversion, and a year later, the charges were dropped.
At the time of the incident, Petitioner was thirty-six years of age. The report of each deputy indicates that Petitioner attempted to run over one deputy and then attempted to flee by trying to drive across the lawn. The deputies' reports say that Petitioner did not stop until an officer drew his weapon and ordered Petitioner from the car.
We generally give some weight to credibility determinations made by fact-finders who had an opportunity to observe witnesses, but we are free to review the testimony de novo, see Disciplinary Bd. of Hawaii Supreme Court v. Bergan, 60 Haw. 546, 592 P.2d 814 (1979), and make our own determination of credibility. Our determination here is not different from the hearing panel's determination.
More importantly, we note that negligently, carelessly, or intentionally using an automobile to escape from real or imagined danger, in a manner that puts the lives of others at risk, and that actually pins a person between cars in the circumstances related by the officers and Petitioner is a record of conduct that evidences a deficiency in trustworthiness or respect for the requirements of the law, and it is not a "record of conduct [that] justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them." See RSCH 1.3(c) (set out above); Cf. In re Silva, 266 Neb. 419, 665 N.W.2d 592 (2003) (Applicant *1088 with history of assaultive behavior, including misdemeanor convictions that he did not fully disclose on his law school application, denied admission. In light of strong, favorable references, applicant was authorized to reapply in two years.); In re Matthews, 94 N.J. 59, 462 A.2d 165 (1983) (Applicant who participated in Ponzi scheme and did not file tax returns denied admission, although eight years had passed, he had made restitution, and the court was unable to "conclude definitely" that he knew the fraudulent nature of the Ponzi scheme. Pattern of activity bespoke of "avarice, selfishness, extraordinary incredulity, and indifference to the welfare and individuals relying on him.").

E. Debt Obligations

Petitioner asserts that the panel "apparently disregarded [his] explanation" that default judgments and bankruptcy filings were related to business failures.[21] "[R]emaining questions," Petitioner asserts, "could have been answered had the hearing [panel] simply asked the questions that apparently were on their minds." Petitioner says that there was no question about misapplication or misdirection of client funds and opines that the panel abused its power to the extent that it "suggest[s] ... he is undeserving" "because [his] business plans were not financially successful[.]" Petitioner notes that one of his bankruptcy filings occurred nineteen years ago and that the most recent occurred over ten years ago.
The hearing panel's findings with regard to Petitioner's numerous debt problems are not necessarily an indication the panel ignored Petitioner's explanations. The hearing panel's findings could be an indication that the hearing panel found the explanations to be unpersuasive or that the explanations did not mitigate the fact that Petitioner exhibited a very clear pattern of financial irresponsibility.
We are cognizant that Petitioner's bankruptcies alone cannot justify denying a license to practice law. See 11 U.S.C.A. § 525(a).[22] The Oregon Supreme Court explained the distinction between considering an applicant's financial reputation and considering bankruptcy alone thus:
The fact that petitioner filed for bankruptcy, standing alone, is not a factor which we consider in determining his moral fitness. The bankruptcy statutes prevent a rule which would preclude applicant's admission to the Bar solely because he declared bankruptcy. However, an applicant's handling of financial affairs is regularly considered in determining moral fitness. See, e.g., In re Cheek, 246 Or. 433, 425 P.2d 763 (1967); In re Connor, 265 Ind. 610, 358 N.E.2d 120 (1976); In re O'Brien's Petition, 79 Conn. 46, 63 A. 777 (1906). The bankruptcy statutes do not prohibit examination of the circumstances surrounding bankruptcy, as these circumstances illustrate an applicant's judgment *1089 in handling serious financial obligations.[FN4]
FN4. The legislative history of the Bankruptcy Act indicates that Congress intended to bar a per se rule which would make filing in bankruptcy an automatic bar to a license or similar grant. Congress did not intend to preclude examination of the circumstances surrounding bankruptcy. "The prohibition does not extend so far as to prohibit examination of the factors surrounding the bankruptcy, the imposition of financial responsibility rules if they are not imposed only on former bankrupts, or the examination of prospective financial condition or managerial ability. The purpose of the section is to prevent automatic reaction against an individual for availing himself of the protection of the bankruptcy laws. * * * (I)n those cases where the causes of bankruptcy are intimately connected with the license, grant, or employment in question, an examination into the circumstances surrounding the bankruptcy will permit governmental units to pursue appropriate regulatory policies and take appropriate action without funning afoul of bankruptcy policy." (Emphasis added) [sic] H.R.Rep. No.95-595, 95th Cong. 1st Sess. at 165 (1977), reprinted in 5 U.S.Code Cong. & Admin.News, 95th Cong.2d Sess. 5787, 5963, 6126 (1978).
The Supreme Court of Minnesota recently considered the application for admission of a person who had discharged student loans in bankruptcy. After reviewing the legal considerations pertinent to the evaluation of such bankruptcies, the court said:
"We hold that applicants who flagrantly disregard the rights of others and default on serious financial obligations, such as student loans, are lacking in good moral character if the default is neglectful, irresponsible, and cannot be excused by a compelling hardship that is reasonably beyond the control of the applicant. Such hardship might include an unusual misfortune, a catastrophe, an over riding financial obligation, or unavoidable unemployment."
In re Gahan, 279 N.W.2d 826, 831 (Minn.1979). The Supreme Court of Florida formulated a similar standard in cases of two applicants who had discharged student loans in bankruptcy. Florida Bd. of Bar Examiners re Groot, 365 So.2d 164 (Fla. 1978); Florida Bd. of Bar Examiners re GWL, 364 So.2d 454 (Fla.1978).
Examining the circumstances surrounding applicant's discharge of his student loans, we find no extraordinary hardship which would compel resort to bankruptcy. When he declared bankruptcy, applicant's current liabilities did exceed his current assets, but he acknowledged before the Board of Bar Examiners that he could have managed his debts, including his student loans, had he wished to do so. His own explanation of his resort to bankruptcy is that he felt that society owed him an education. At the time, applicant was employed in a steady position, with a gross annual income of approximately $10,000. He faced no catastrophe or unusual misfortune. Further, he made no effort to adjust, extend, or renegotiate his student loans. On the other hand, he reaffirmed several other debts, those on which his creditors held security over property which he wished to retain.
Applicant had a legal right to discharge his student loans in bankruptcy as he did, and our decision herein is not based on his exercise of that right. The circumstances of his bankruptcy, however, show a selfish exercise of legal rights and a disregard of moral responsibilities. The bankruptcy statutes prescribe only the criteria needed to discharge debts; they do not say what is required to demonstrate good moral character. Cf. Holmes, The Path of the Law, 10 Harv. L.Rev. 457, 459 (1897): "If you want to know the law and nothing else, you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict."
We need not decide whether we would find that applicant's moral character is wanting on the basis of his discharge of student loans alone. We declare to all *1090 attorneys and future applicants the importance of scrupulously honoring all financial obligations. With respect to this applicant, his discharge of student loans is a fact which we consider.[FN5]
FN5. We also note that the Bankruptcy Act of 1978 changed the law, restricting the right to discharge student loans. Under the current statutes, unless there is a showing of undue hardship, an individual must make payments on student loans for five years before they are subject to discharge in bankruptcy. See 11 U.S.C.A. § 523(a)(8).
In re Taylor, 647 P.2d at 466-67; Accord In re Anonymous, 74 N.Y.2d 938, 550 N.Y.S.2d 270, 549 N.E.2d 472, 473-74 (1989) ("[T]he [bankruptcy] statute was not intended to shield debtors from reasonable inquiries about their ability to manage financial matters when the ability to do so is related to their fitness for the license sought.... A determination of unfitness must rest not on the fact of bankruptcy but on conduct reasonably viewed as incompatible with a lawyer's duties and responsibilities as a member of the bar." (Citations omitted.)); In re Gahan, 279 N.W.2d at 828-29 ("The fact of filing bankruptcy or the refusal to reinstate obligations discharged in bankruptcy cannot be a basis for denial of admission to the bar.... Any refusal so grounded would violate the Supremacy Clause of the United States Constitution since applicable Federal law clearly prohibits such a result[,] ... and state law may not chill the exercise of that right.... However, these constitutional limitations do not preclude a court from inquiring into the bar applicant's responsibility or moral character in financial matters." (Citations omitted.)).
Petitioner completed law school in 1980. According to the record, by 1985, Petitioner had unpaid debts totaling more than $90,000. The debts included nearly $36,000 in unpaid taxes, unpaid equipment leases, money borrowed to purchase office furniture and equipment, a business loan, and credit purchases of office supplies, including law books, and professional services. A bankruptcy discharge in 1985 provided Petitioner with a fresh start, but, by 1993, he was again unable to meet his obligations and listed outstanding unsecured debt of more than $373,000 that included more than $70,000 in unpaid office rent, as well as debts owed for various services and charge cards, some of which had been reduced to creditor judgments.
The fact that the pattern of Petitioner's financial irresponsibility is related, for the most part, to businesses other than the practice of law is irrelevant. Cf. Bergan, 60 Haw. at 553-54, 592 P.2d at 818 ("we will not hesitate to impose substantial sanctions upon an attorney for any act whether committed in a professional capacity or not which evidences want of personal honesty and integrity or renders such attorney unworthy of public confidence"). The failure to pay debts is an appropriate subject for attempting to determine whether a bar applicant has shown financial responsibility and one of the specifically enumerated factors for determining whether a bar applicant has proven good character. See RSCH 1.3(c)(1)(v); cf. In re R.M.C., 272 Ga. 99, 525 S.E.2d 100, 101, cert. denied, 531 U.S. 854, 121 S.Ct. 133, 148 L.Ed.2d 86, reh'g denied, 531 U.S. 854, 121 S.Ct. 133, 148 L.Ed.2d 86 (2000) ("Lack of fiscal responsibility, failure to cooperate with the Board, and a lack of candor are all bases on which certification may be denied.... It is not the fact of debt, but the absence of genuine effort to meet one's responsibilities which serves to establish a lack of the character and integrity expected and required of one who seeks to become a member of the Bar of Georgia." (Citations omitted.)); In re Gahan, 279 N.W.2d at 830 ("The conduct of a bar applicant in satisfying his financial obligations has been widely recognized as a relevant factor in assessing good moral character.... The failure of a person to honor his legal commitments adversely reflects on his ability to practice law, evincing a disregard for the rights of others." (Citations omitted.)); Florida Bar Examiners v. G.M.C., 658 So.2d 76 (Fla.1995) (approved denial of application where Board concluded failure to pay twelve delinquent creditor accounts totaling more than $32,000, defaulted student loans totaling $50,000, and three unsatisfied judgments for failure to make timely payments on outstanding debts, exhibited pattern *1091 of irresponsible conduct or faulty judgment reflecting adversely on the applicant's ability to accept the responsibilities and perform the duties of a practicing attorney).
Petitioner's credit history provides a clear and repeated pattern of irresponsibility with regard to his financial obligations. We are well aware that financial irresponsibility is a frequent subject of attorney disciplinary proceedings and often includes misappropriation of client funds to meet personal expenses. Petitioner's credit history is not one from which we can conclude that Petitioner's character would justify the trust of clients, adversaries, or others with regard to the professional duties owed to them.

F. Burden of Proof and Persuasion

Petitioner opines that the panel "has not produced nor referenced any evidence that refutes the evidence he provided that [he] is of good moral character and has requisite character and fitness to be a member of the Hawai`i state bar." Petitioner asserts that the panel's "findings of fact do not show a record ... manifesting a deficiency in honesty, trustworthiness, diligence, or reliability." Petitioner asserts that he "has committed no crime, no bad acts." "If he had," Petitioner writes, "prior to admission [[23]] he would be required to show evidence of rehabilitation." Petitioner says he "was merely falsely accused of crimes and bad acts."
Contrary to his hint, Petitioner was not required to "show evidence of rehabilitation" before reinstatement in Missouri. Petitioner was reinstated under Missouri Supreme Court Rule 5.21(b), quoted in Petitioner's Missouri "motion to set aside suspension" as follows:
(b) If an order of suspension based upon such plea or finding is entered and, thereafter, the suspended lawyer files a certified copy of an order rejecting or setting aside the guilty plea or plea of nolo contendere or the order of a court reversing or setting aside the finding of guilty, this Court shall immediately enter an order reinstating said lawyer unless the lawyer is under suspension or disbarred as a result of having been found guilty of professional misconduct in a disciplinary proceeding brought pursuant to this Rule 5. Such reinstatement shall not bar prosecution in a disciplinary proceeding against the lawyer.[[24]]
That is, unlike Petitioner's application proceeding before this court, the Missouri reinstatement did not require proof of character and competence.
More importantly, the burden of providing a character record is upon the applicant, not the Board of Examiners or the hearing panel. See RSCH 1.3(c)(2). Unfortunately for Petitioner, the record he provided is not a record from which we can conclude that we can entrust the lives, rights, and property of clients to him.

G. Other Bar Memberships

Petitioner notes that he is a member is good standing of the Missouri State Bar and the bars of the United States District Court for the Western District of Missouri and the United States Court of Appeals for the Eighth Circuit. Petitioner asks us to allow him to sit for the next scheduled bar examination and be admitted if he passes it.
"The fact that a lawyer is licensed to engage in the general practice of law in one state does not give him a vested right to freely exercise such license in other states." In re Petition of Avery, 44 Haw. 597, 598, 358 P.2d 709, 710 (1961) (citations omitted).

IV. CONCLUSION

In consideration of the record, Petitioner's request to sit for the Hawai`i bar examination *1092 and his application for admission to the Hawai`i bar are denied.
NOTES
[1] HBBE § 4.4 provides:

Petition for Supreme Court Review. An applicant may file a petition with the Clerk for review of the hearing officer's or panel's recommendation within twenty (20) days after service of the findings and recommendation.
[2] RSCH 1.3(e) provides:

Review of Adverse Recommendations as to Good Character and Fitness. An applicant may petition the Supreme Court for review of an adverse recommendation that is based upon the applicant's failure to establish good character and fitness by filing with the Clerk a petition for review within twenty (20) days after receiving the adverse recommendation relating to character and fitness.
[3] K.S.A. § 21-3603 provides:

Aggravated incest.
(a) Aggravated incest is: (1) Marriage to a person who is under 18 years of age and who is known to the offender to be related to the offender as any of the following biological, step or adoptive relatives: Child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew or niece; or (2) engaging in: (A) Otherwise lawful sexual intercourse or sodomy as defined by K.S.A. 21-3501 and amendments thereto; or (B) any lewd fondling, as described in subsection (a)(1) of K.S.A. 21-3503 and amendments thereto, with a person who is 16 or more years of age but under 18 years of age and who is known to the offender to be related to the offender as any of the following biological, step or adoptive relatives: Child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew or niece.
(b) Aggravated incest as described in subsection (a)(2)(A) is a severity level 5, person felony. Aggravated incest as described in subsections (a)(1) and (a)(2)(B) is a severity level 7, person felony.
[4] K.S.A. § 21-4501 provides:

Classes of felonies and terms of imprisonment; crimes committed prior to July 1, 1993. For the purpose of sentencing, the following classes of felonies and terms of imprisonment authorized for each class are established:
(a) Class A, the sentence for which shall be imprisonment for life.
(b) Class B, the sentence for which shall be an indeterminate term of imprisonment, the minimum of which shall be fixed by the court at not less than five years nor more than 15 years and the maximum of which shall be fixed by the court at not less than 20 years nor more than life.
(c) Class C, the sentence for which shall be an indeterminate term of imprisonment, the minimum of which shall be fixed by the court at not less than three years nor more than five years and the maximum of which shall be fixed by the court at not less than 10 years nor more than 20 years.
(d) Class D, the sentence for which shall be an indeterminate term of imprisonment fixed by the court as follows:
(1) For a crime specified in article 34, 35 or 36 of chapter 21 of the Kansas Statutes Annotated, a minimum of not less than two years nor more than three years and a maximum of not less than five years nor more than 10 years; and
(2) for any other crime, a minimum of not less than one year nor more than three years and a maximum of not less than five years nor more than 10 years.
(e) Class E, the sentence for which shall be an indeterminate term of imprisonment, the minimum of which shall be one year and the maximum of which shall be fixed by the court at not less than two years nor more than five years.
(f) Unclassified felonies, which shall include all crimes declared to be felonies without specification as to class, the sentence for which shall be in accordance with the sentence specified in the statute that defines the crime. If no sentence is provided in the statute, the offender shall be sentenced as for a class E felony.
(g) The provisions of this section shall not apply to crimes committed on or after July 1, 1993.
[5] The 1985 bankruptcy was filed on behalf of petitioner, his then wife, and their businesses. It appears that the 1985 bankruptcy discharged approximately $222,150.38 in debt, more than $90,000 of which was listed as petitioner's debt. The 1994 bankruptcy discharged approximately $373,630.97 in debt.
[6] HBBE § 2.12 provides:

Request for Hearing.
(a) An applicant may seek review of the Board's or the [Applications Review Committee's (]ARC[)] recommendation to deny an application under Section 2.11 by filing, with the Clerk, a written request for a hearing. The request must be filed within twenty (20) days after receipt of the notice of the recommendation.
(b) The hearing shall be conducted in accordance with the provisions of Part 4.
[7] Petitioner was advised that the "hearing [was] to provide [him] with an opportunity to say and present whatever witnesses, evidence, [and] materials [he ... felt] appropriate[.]" Petitioner produced four witnesses: his wife, his pastor, a next-door neighbor, and a friend and fellow Rotarian.
[8] Petitioner does not cite case law, statutory law, constitutional provisions, treatises, or other authority in support of his contentions.
[9] Pertinent findings are summarized under the "Background" heading above.
[10] Finding 26 states:

Although the Kansas supreme court reversed the convictions referred to above due to trial error and remanded the matter for a new trial and the State eventually declined to prosecute further, there is nothing in the trial record, that shows Applicant was falsely accused of the offenses. Moreover, in its opinion, the court noted:
Standing alone, the cumulative effect of the trial errors involving the charges as to S.S. do not rise to the level which denied the defendant a fair trial. However, we must view the charges involving S.S. in the context in which they were tried, jointly with the charge involving A.W.
Consequently, it appears that the convictions related to S.S. may have been sustained if the charges related to her were not joined with the charge involving A.W.
[11] Finding 27 states:

Furthermore, there is also information in the Applicant's application that Applicant, during the investigation into the charged offenses, informed police that an adult female also accused Applicant of a sexual assault in relation to Applicant's actions when he was working as a fashion photographer in his business ... located in Kansas after a dispute over payment of a bill, but that he did not know whether the woman filed a police report.
[12] The hearing panel appears to have considered additional materials solicited by the hearing panel, received from Kansas police, but not provided to Petitioner. Because the materials were not provided to Petitioner and Petitioner was given no opportunity to examine or rebut them, the materials played no part in the disposition of Petitioner's Petition for Review. HBBE § 2.5 authorizes the Board, the Application Review Committee, and the staff to investigate and gather additional evidence. We admonish that, when such evidence is gathered, due process requires that the applicant be given an opportunity to examine and challenge the evidence before the evidence may be considered.
[13] Finding 28 states:

Applicant's character witnesses at the hearing have known him for less than two years and received all information regarding Applicant's past from Applicant and his wife. It is not clear that they were informed of all circumstances surrounding the events or that they knew all of the charges against him.
[14] Character evidence in the NCBE report is mixed. Four individuals, who identified their relationships with Petitioner as "business," and who knew Petitioner for periods ranging from seven to fourteen years, marked "yes" in response to "Do you recommend that the applicant be admitted to the bar?" One, self-identified as a "partner/friend," also responded "yes" to the question.

Three former law employers responded on NCBE forms. One marked "yes" in response to "would you rehire"; two marked "no." The two who marked "no" indicated Petitioner left their firms by "mutual agreement." In response to "do you believe this person possesses the character and fitness for the practice of law," one marked "yes," one marked "no," and one wrote "Not certain. It seemed that he left a lot of work unfinished and in a mess." The three law employers reported short periods of employment ranging from twelve months to forty-six months duration. All of this employment occurred from 1978 (law clerk) to 1990. The earliest of the law employers is the one who answered "yes" to both questions.
[15] RSCH Rule 1.3(d) provides:

Investigation of Applications. The Board, any delegated committee, or designee shall investigate the applications, and may inquire into the information included in, and relevant to, each application. The Board may conduct proceedings necessary for a full and fair review of each application in accordance with its Rules of Procedure. The Clerk may issue subpoenas to compel the attendance of witnesses or the production of documents or other information in connection with such proceedings. An application may be held in abeyance by the Board pending the receipt of additional information to complete the investigation. If an applicant refuses or is unable to provide additional requested information, the recommendation to the Supreme Court shall be made on the basis of the existing information. The Board, any delegated committee, or designee shall report the results of the investigation and recommendations to the Supreme Court.
[16] HBBE § 2.5 provides:

Investigation of Applications; Application Held in Abeyance. The Board, the ARC, the judiciary staff, or a Board designee shall review each application and may investigate the applicant's background and qualifications to determine whether to recommend to the Supreme Court that the applicant be allowed to sit for the Hawaii Bar Examination or be admitted to the Bar of Hawai`i. The Board, the ARC, or the judiciary staff may contact such sources as necessary to obtain and verify information about the applicant. The review may include an interview with the applicant.
[17] HBBE § 2.6 provides:

Evaluation of Applicants for Good Character, Fitness to Practice, and Financial Responsibility by National Conference of Bar Examiners and Board.
(a) Each applicant shall undergo a character investigation by the National Conference of Bar Examiners (NCBE). Each applicant shall submit the NCBE fee with his or her application. Each applicant is required to contact the NCBE to determine the amount of the fee. The Clerk shall dismiss without prejudice the application if the applicant does not submit the NCBE fee or submits an incorrect amount.
(b) The Board, the ARC, or the judiciary staff shall review the application to determine whether the applicant has provided character and fitness evidence. The Board or the ARC shall consider whether the evidence meets the standard of character and fitness set forth in Rule 1, RSCH.
(c) The following factors, among others, adversely reflect on an applicant's character and fitness to practice law and may constitute cause for additional inquiry or a recommendation to deny the application:
(1) unlawful conduct;
(2) academic misconduct;
(3) false statements;
(4) relevant and material omissions;
(5) misconduct in employment;
(6) acts involving, dishonesty, fraud, deceit, or misrepresentation;
(7) abuse of legal process;
(8) neglect of professional obligations;
(9) violation of a court order;
(10) denial of admission in another jurisdiction on character or fitness grounds;
(11) legal or professional disciplinary action in any jurisdiction;
(12) failure to conform conduct to the requirements of the law;
(13) a pattern of offenses, even ones of minor significance indicating indifference to legal obligation; and
(14) financial irresponsibility.
(d) When reviewing an applicant's conduct, the following factors, among others, may be considered as mitigating factors:
(1) the applicant's age at the time of the conduct;
(2) when the conduct occurred;
(3) reliability of the information concerning the conduct;
(4) seriousness of the conduct;
(5) circumstances in which the conduct occurred;
(6) the cumulative effect of conduct or information;
(7) evidence of rehabilitation;
(8) positive social contributions since the conduct;
(9) candor in the admissions process; and
(10) materiality of omissions or misrepresentations.
[18] A panel hearing could become adversarial if the Board Chair appointed an attorney to represent the ARC or American with Disabilities Act (ADA) committees before the hearing panel. See HBBE § 4.1(b) ("The Chairperson may appoint an attorney to represent the ARC or ADA committee before the hearing officer or panel.").
[19] Finding 29 states:

In addition to testifying that he was falsely accused of sexual assault, Applicant also testified that the 1991 aggravated battery charge against him was a mistake. His explanation of that offense is not credible.
[20] Presumably, Law Enforcement Officer.
[21] Findings 30 and 31 state:

30. With regard to the other areas of concern, the record shows that Applicant had numerous default judgments against him prior to filing for bankruptcy where all of the judgments were discharged.
31. There is no satisfactory explanation in the record or presented by Applicant to show why he allowed all of the default judgments to be entered against him.
[22] 11 U.S.C.A. § 525 provides:

Protection against discriminatory treatment.
(a) Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.
(Emphasis added.)
[23] Petitioner apparently means reinstatement in Missouri.
[24] Missouri's Supreme Court Rule 5.21(b) is substantially similar to RSCH 2.13(f):

(f) If a lawyer is suspended solely under the provision of paragraph (b) demonstrates to this court that the underlying finding of guilt has been reversed or vacated, the order for interim suspension shall be vacated and, upon payment of all required registration fees, the lawyer may be placed on active status. Vacation of the interim suspension will not automatically prohibit or terminate any formal proceeding against the lawyer and disposition of any formal proceeding against the lawyer must be on the basis of the available evidence other than the finding of guilt.